NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0480n.06
Filed: July 10, 2006

No. 05-1856

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

BASIM ALKHATEEB, *et al*.,

    Plaintiffs-Appellants,

v.

CHARTER TOWNSHIP OF WATERFORD, *et al*.,

    Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

_____/

Before:    MARTIN, NORRIS, and McKEAGUE, Circuit Judges.

BOYCE F. MARTIN, JR., Circuit Judge. The plaintiffs filed this Section 1983 civil rights action alleging violations of their Fourth and Fourteenth Amendment rights. The defendant police officers filed motions for summary judgment which the district court granted in part and denied in part. With regard to plaintiff Basim Alkhateeb's excessive force claim, the district court found a genuine issue of material fact which precluded summary judgment. In a footnote, the district court found that "[t]his same contradictory evidence as to the reasonableness of force used by the officers compels denial of summary judgment on qualified immunity grounds, as well." Dist. Ct. Op. at 26 n.10. The only issue before this Court is whether the officers were improperly denied qualified immunity with respect to Basim Alkhateeb's claim for excessive force. For the following reasons, we AFFIRM the district court's judgment denying qualified immunity, but reach this conclusion as the result of a slightly different analysis.

**I.**

The district court made the following factual findings.

This action arises out of events that occurred in a residential subdivision in Waterford Township, Michigan in 2002. In May 2002, residents of Lorena Drive in Waterford Township became aware of increasingly suspicious activity in their neighborhood involving a blue Nissan car, an ice cream truck and three men (the Plaintiffs in this lawsuit). Marcia Bovee, a resident of the Waterford Township subdivision where the actions complained of transpired, testified that she began noticing suspicious activity taking place in front of her house on Lorena Drive in late April or early May 2002. She testified that she first noticed that a man driving a blue Nissan appeared on Lorena Drive two to three times each week, every week for several weeks, at about the same time -- shortly after school let out for the day. The blue Nissan would enter Lorena Drive from Watkins Lake Road, make a "U-turn" and park, facing east, in front of 3515 Lorena. The man would sit in his car for 20 to 30 minutes at a time, watching children play, and then he would leave. One time, Mrs. Bovee watched as the man followed two 12-year-old girls from the neighborhood, while they were riding their bicycles through the subdivision.

After a few weeks, the neighbors noticed that the appearance of the Nissan was somehow related to the appearance of an ice cream truck in the neighborhood. The blue Nissan would appear first and park on the south side of the street, facing east. A few minutes later, the ice cream truck would appear and park on the north side of the street, facing west. Ms. Bovee watched closely and observed that each time, the driver of the blue Nissan would exit his car and walk to the side window of the ice cream truck where the driver of the ice cream truck would hand a bag to the driver of the Nissan. Each time, the Nissan driver would take the bag back to his car and leave. [FN2]

> [FN2] Throughout the course of this litigation, Plaintiffs have offered various explanations of what the neighbors on Lorena observed. At one time, they claimed that one brother would bring the other brothers who worked the ice cream truck dinner each night and this is what the people in the neighborhood must have seen. In another brief on a discovery motion, they claimed that they only have one car and they had to share that car. Abedulah, who worked during the day as an engineer with Chrysler Corporation, would drive his car to work and, then when he was done at Chrysler, would meet his brothers who sold ice cream from their ice cream truck in a subdivision so that Basim could take the car to go to his night classes

at Oakland University. Plaintiffs' current explanation is that Abedulah and his brother-in-law own the ice cream truck and Basim and Qasim were only helping Abedulah out with the ice cream business while his brother-in-law was on vacation. So, for three days prior to June 20, 2002, they coordinated their work and school schedules and met in the subdivision to allow for each other's use of the car for work or school purposes.

Ms. Bovee had thought when she saw the man following the girls riding their bikes that the man was a child abductor; when she observed the exchange of the bags, she thought the driver was selling drugs out of the ice cream truck. She testified that she contacted everyone she knew in the neighborhood and told them to be on the lookout for the blue Nissan and the ice cream truck. Soon thereafter, the Waterford Police Department began receiving complaints of the suspicious activities. [footnote omitted]

The next time Mrs. Bovee saw the blue Nissan pull onto Lorena, she told her two grandsons, Thomas and Eric Michaels, to stay away from the men and the vehicles. Brent Mortimer, Thomas Michaels' friend, however, had not been warned to stay away from the vehicles, and so, when the ice cream truck stopped on the street, Brent ran up to it and ordered an ice cream. Thomas Michaels stood by his friend, "to protect him." Mrs. Bovee said that Thomas told her that he saw a bag passed from one driver to the other, and that he saw strange looking foil packets on the floor of the truck.

When Thomas's and Eric's mother came to pick her sons up from their grandmother's house, Mrs. Bovee told her what had happened. Mrs. Michaels said that she was taking Thomas directly to the police department to report the suspicious activity.

At 7:00 p.m. on June 17, 2002, Jill and Thomas Michaels met with Waterford Police Sergeant Giovani Palombo. Mrs. Thomas explained to Officer Palombo that she did not personally witness anything, but that her son, Michael did. Officer Palombo, accordingly, questioned Michael. According to Mrs. Thomas, Michael described the men in the Nissan and the ice cream truck for Officer Palombo as having "dark hair and darker skin." [FN 4] After meeting with Mrs. Michaels and her son, Sergeant Palombo, wrote a report and forwarded a copy of the report to the Detective Bureau, because he felt that the complaint deserved immediate attention.

[FN 4] Officer Palombo recorded the description of the men as having been given by "Ms. Michaels" and that they were "Arab."

Three days later, on June 20, 2002, at approximately 5:15 p.m., Mrs. Bovee again saw the blue Nissan pull onto Lorena. Mrs. Bovee looked across the street and caught the attention of two of her neighbors, Debbie Bruce and Debbie Boik, and gestured to them to note the re-appearance of the Nissan. The two women nodded, affirming that they, too, had noticed the car's reappearance. Mrs. Boik informed Mrs. Bruce that she had heard that the blue Nissan had been observed parked on other streets in the subdivision as well and, after seeing the Nissan on Lorena again, she announced that she was calling the police.

Debbie Boik called the Waterford Police from her cell phone in the car and spoke with Dispatcher Deborah Mathewson. After hearing Mrs. Boik's account of her observations, Dispatcher Mathewson believed that the Plaintiffs were selling drugs out of the ice cream truck and felt that Mrs. Boik's complaint was sufficiently serious to justify dispatching an undercover unit. Narcotic Enforcement Officer Rick Lemos told the dispatcher that he was familiar with the citizen complaints involving the blue Nissan and the ice cream truck. He told her that he was on his way to Lorena and would investigate, and asked that she have marked patrol cars in the area standing by in case he needed backup. Officer Scott Good, who was also in plain clothes, also responded and was on the scene in a separate unmarked vehicle when Officer Lemos arrived.

Officer Lemos arrived on Lorena and observed two men (Plaintiffs Abedulah and Qasim Alkhateeb) sitting in the blue Nissan at approximately 5:30 p.m. Lemos testified that he took charge of the surveillance of the blue Nissan. Officer Good had the ice cream truck under surveillance. Lemos and Good coordinated their activities via Nextel telephone.

A few minutes after Officer Lemos arrived, he saw the ice cream truck (driven by Plaintiff Basim Alkhateeb) arrive and park on the north side of the street. Lemos and Good observed the Plaintiffs exit their vehicles, meet in the middle of the street, exchange a bag of some sort, return to the opposite vehicles from which they had arrived. Basim went to the car, placed something in the trunk, then got in the car. Abedulah and Qasim went to the ice cream truck.

Officer Lemos prevented the vehicles from leaving the scene by pulling his unmarked vehicle (a truck) diagonally across the roadway. He yelled "Police! Stop!" as he stepped out of the truck with a gun in his hand, and his police badge hanging on a chain around his neck. As Officer Lemos approached the Nissan, Officer Good approached the ice cream truck. Lemos radioed dispatch that Plaintiffs were being detained and requested uniformed assistance. Officers Ross and Warner arrived in their squad car and Officer Bartle arrived shortly thereafter in a second marked car.[FN 5]

[FN 5]  Officer Bartle's car was equipped with an in-car video camera and recorded the event.

Officer Lemos testified that he ordered Basim Alkhateeb to get out of the Nissan.  Once Basim exited the car, Lemos ordered him to get on the ground.  He testified that he had to repeat the directive two or three times before Basim complied. According to Lemos, Basim first knelt down, then laid down on his stomach.  Within a few seconds, the uniformed unit arrived.  Officer Ross assisted Officer Lemos with the detention of Basim.

Lemos testified that Officer Ross handcuffed Basim, while he stood in front of him.  After Basim was handcuffed, Lemos directed Ross to pat him down.  Basim was then helped to his feet by Officer Ross and placed in the back seat of his squad car.

Meanwhile, Officer Warner assisted Officer Good with the detention of Abedulah and Qasim Alkhateeb.  Officer Good testified that Officer Warner handcuffed and patted down the two men.  They, too, were assisted up off the ground and placed in the back seat of the other squad car.

Officer Warner testified that, once he was assured after a pat down that there were no handguns or weapons on the two brothers, he asked each where he could find their identification. Warner said that one of the two brothers he had handcuffed indicated that his identification was in one of his pockets and Warner retrieved the ID from that pocket.  He then contacted Detective Lemos because he wanted him to look at the papers he had retrieved.  These papers included a photo of Basim Alkhateeb in a military uniform, money transfers to Jordan, bank account information, a passage from the Koran, and a calendar page for September 2001 with a name and phone number written on it.  The papers were given to Detective Lemos who, upon returning to the station, contacted the FBI.  The agent he spoke with at the FBI directed Lemos to make copies of the documents and forward them to the FBI's Detroit office, which he did.

At 5:42 p.m., the officers requested that Officer Quaiatto and Elvis, his drugsniffing dog, be dispatched to Lorena.  Officer Quaiatto arrived at 6:00 p.m.[FN 6] Elvis checked the vehicles for narcotics but did not make any alerts.  As soon as Officer Quaiatto and Elvis finished checking the vehicles, Plaintiffs were released. According to the patrol car videotape, the entire stop lasted 38 minutes.[FN 7]

> [FN 6] While waiting for the arrival of Officer Quaiatto, officers at the scene radioed dispatch asking that Plaintiffs and their vehicles be checked for any wants or warrants.

> [FN 7] Plaintiffs claim that their actual detention lasted 45 minutes because the video camera was not turned on until Officer Brattle arrived, and he did not arrive until after Officers Lemos and Good had already ordered Plaintiffs out of their vehicles and onto the ground.

The detention of Plaintiffs was witnessed by several neighborhood residents who were outside enjoying the summer. Kim Mortimore and Andy Woodiwiss were picking their children up from Debbie Bruce's house; Marcia Bovee was watching her two grandsons, Michael and Eric Thomas, skateboarding in front of her house; Nikki Hellner was playing in her driveway with her 7-year-old son; and Craig and Debbie Brace were unloading new furniture and carrying it into their house. All of these eyewitnesses testified in their depositions that the police officers conducted themselves in a calm, orderly and professional manner during the entire 38-minute investigation and that the Plaintiffs were never verbally nor physically abused.

On September 18, 2002, Plaintiffs initiated this Section 1983 lawsuit claiming that their constitutional rights were violated on June 20, 2002. Specifically, Basim Alkhateeb claims that Detective Lemos kicked him in the back, put a gun to his head, swore at him, and repeatedly demanded to know whether he was Arabic. He also claims that another officer knelt down hard on the back of his neck while he was lying prone and being handcuffed. Abedulah Alkhateeb claims that he was handled "too roughly," as though the officer thought "he might try to escape." Qasim Alkhateeb claims that one of the officers grabbed his arm too firmly.

Plaintiffs contend that the officers' actions were motivated because of their Arabic ethnicity and/or religious background, and that, by the officers' actions on June 20, 2002, their rights under the Equal Protection clause of the Fourteenth Amendment were violated (Count I). They further allege that they were subjected to unlawful searches and seizures in violation of their Fourth Amendment rights (Count II). They also allege a *Monell* policy and practice claim against Waterford Township (Count III), and a § 1985 conspiracy claim (Count IV). Additionally, Plaintiffs allege state law claims of ethnic intimidation pursuant to M.C.L. § 750.147b (Count V); false imprisonment (Count VI); assault and battery (Count VII); intentional infliction of emotional distress (Count VIII); and gross negligence (Count IX).

The district court granted the defendant's motion for summary judgment on all claims except for Basim's claim under the Fourth Amendment for excessive force. On that claim, the district court found that "the record evidence of this case establishes that there exists a genuine issue of material fact regarding the degree of force used by the officers with regard to the detention of Plaintiff Basim Alkhateeb." Dist. Ct. Op. at 25. Finding it inappropriate to weigh competing evidence, the court denied summary judgment and, in a footnote, denied qualified immunity based on the same dispute of fact. The officers have appealed and the only issue before the Court is whether the defendants were entitled to qualified immunity with respect to Basim's excessive force claim. The plaintiffs have not at this time cross-appealed the grant of summary judgment on their remaining claims.

**II.**

*A.      Jurisdiction*

The defendants bring this interlocutory appeal claiming that the district court erred by not granting them qualified immunity. The plaintiffs first argue in their brief that this Court does not have jurisdiction. They are wrong. *Mitchell v. Forsyth*, 472 U.S. 511 (1985) and *Johnson v. Jones*, 515 U.S. 304 (1995) permit the defendants to appeal this purely legal question. As this Court has stated:

> A defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law. If the defendant does not dispute the facts alleged by the plaintiff for purposes of the appeal, "our jurisdiction is clear." If, instead, the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for the purposes of the appeal. Only if the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a *prima facie* violation of clear constitutional law may we decide that the defendant is entitled to qualified immunity on an interlocutory appeal.

*Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998). For purposes of this interlocutory appeal, the defendants have explicitly conceded the most favorable view of the facts to the plaintiff. This Court, therefore, has jurisdiction and the plaintiffs' argument to the contrary has no merit.

### B.       Excessive Force Claims

Excessive force claims in the context of "an arrest, investigatory stop, or other 'seizure'" are analyzed pursuant to the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal citations omitted). If an officer has the right to make an arrest or stop, that authority "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* Because the standard is "objective reasonableness," courts must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Finally, reasonableness must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," because "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Id.* (internal citations and quotation marks omitted).

Because a claim for qualified immunity was not at issue, *Graham* did not address the objective reasonableness standard and its interrelationship with the qualified immunity analysis. As

a result, many courts, including this Court, equated the two standards. *See e.g.*, *Bass v. Robinson*, 167 F.3d 1041, 1051 (6th Cir. 1999) ("We . . . hold that Defendants are not entitled to qualified immunity on this claim because a question of fact exists as to whether Defendants used excessive force and thus violated rights that were clearly established at the time."); *Pray v. City of Sandusky*, 49 F.3d 1154, 1156 (6th Cir. 1995) ("We agree that genuine issues of material fact remain with respect to the defense of qualified immunity, and therefore, conclude that summary judgment is inappropriate."); *Jackson v. Hoylman*, 93 F.2d 401 (6th Cir. 1991) ("We conclude that because the parties sharply disagree about the underlying facts of the case, the district court did not abuse its discretion in refusing to grant summary judgment based on qualified immunity.") That is, the courts reasoned, if the force alleged to have been used was objectively unreasonable (and facts were disputed) then qualified immunity must be denied as well. This is essentially what the district court found below — that a dispute of material fact about the extent of the force used precluded summary judgment on qualified immunity grounds. Dist. Ct. Op. at 26 n.10 ("This same contradictory evidence as to the reasonableness of force used by the officers compels denial of summary judgment on qualified immunity grounds, as well.").

In 2001, however, in *Saucier v. Katz*, the Supreme Court held that a "ruling on qualified immunity requires an analysis not susceptible of fusion with the question whether unreasonable force was used in making the arrest." 533 U.S. 194, 197 (2001). Thus, the Court rejected the suggestion that the qualified immunity inquiry is the same inquiry made on the merits. *Id.* at 199.[1]

---

[1]Additionally, because qualified immunity is immunity from suit, the inquiry "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier*, 533 U.S. at 200.

Instead, the Court explained, "[a] court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If no right is violated, the inquiry is at an end. "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.*[2]

Thus, "[t]he inquiries for qualified immunity and excessive force remain distinct, even after *Graham*." *Id.* at 204.[3] After conducting the *Graham* inquiry, *i.e.*, reviewing the list of factors relevant in an excessive force case, there is still a "further dimension" to the qualified immunity analysis. *Id.* at 205. That further dimension recognizes that "[i]f the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to qualified immunity." *Id.* This further dimension acknowledges the fact that *Graham* does not provide a clear answer as to whether a particular use of force is excessive in various factual circumstances and therefore, "[q]ualified

---

[2]In undertaking this part of the analysis, courts are to look to the specific context, not broad general propositions. *Saucier*, 533 U.S. at 201. That is, although it is clear that *Graham v. Connor* "establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness," a more particularized inquiry is required. *Id.* at 201-02. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understanding that what he is doing violates that right." *Id.* at 202 (citation omitted).

[3]Thus, the district court erred by not conducting the second inquiry in the qualified immunity analysis. The district court found that the facts, as alleged by the plaintiff, would establish excessive force in violation of Basim's Fourth Amendment rights, but failed to conduct the second part of the analysis — that is, determining whether the right was clearly established.

immunity operates . . . to protect officers from the sometimes hazy border between excessive and acceptable force." *Id.* at 205-06 (internal quotation marks and citation omitted).

### C.     *Standards applied to this case*

With this framework in mind, the question on appeal is whether the defendants are entitled to qualified immunity. The first step in the inquiry is determining whether any right was violated. *Saucier*, 533 U.S. at 201 ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"). In this case, Basim testified that he was kicked, punched, and threatened with a gun to his head in the course of the stop at issue. Basim also presented medical evidence of his injuries sustained during the stop. The district court found that the facts, viewed in the light most favorable to the plaintiff, could establish an excessive force claim. We agree with the district court.

This Court reviews a decision to grant or deny summary judgment *de novo*. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by 'showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case.'" *Bennett*, 410 F.3d at 817 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted)). "In reviewing a summary

judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The facts, and any inferences that can reasonably be drawn from those facts, must also be viewed in the light most favorable to the non-moving party. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Whether the force used during a seizure is objectively reasonable "depends on the totality of the circumstances, including 1) the severity of the crime, 2) whether the suspect poses an immediate threat to the safety of the officers or others, and 3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (citing *Graham*, 490 U.S. at 396). This list of factors is not exhaustive; the totality of the circumstances must be considered. *Id.* Taking Basim's version of the events, as this Court must,we agree with the district court that the force as alleged was not reasonable and the facts would establish a violation of Basim's Fourth Amendment rights.

First, no crime was committed. *See Ciminillo*, 434 F.3d at 467 (noting that "[o]ther courts have found that the fact that a plaintiff in a § 1983 suit had committed no crime clearly weighed against a finding of reasonableness" and citing *Bailey v. Kennedy*, 349 F.3d 731, 743-44 (4th Cir. 2003)). Although the defendants testified that they believed they were responding to a call about drug activity, the record shows that the dispatcher coded the citizen call as "Blue" with code number 9027 meaning "surveillance detail." JA 537. If the citizen call were for suspicion of drug

trafficking, the call would have been coded "Red" with number 1800 meaning "narcotics complaint."

Second, there is no evidence that Basim and his brothers posed any kind of threat to the officers. When Officer Lemos drew his weapon and ordered Basim to the ground, Basim complied. Basim then complied by putting his hands behind his neck. Basim then alleges that while on the ground with his hands behind his head, Lemos asked Basim if he was "Arab," and then repeatedly kicked him and yelled at him. Basim alleges that Lemos then pointed his gun at Basim's head and pressed the gun to his temple. According to Basim's version of events, Officer Ross then approached and placed his knees on the back of Basim's neck. The officers then immediately searched Basim's pockets and confiscated his personal possessions without his consent. At no time did Basim act in a threatening manner or attempt to resist or flee. *See Ciminillo*, 434 F.3d at 467 (finding it relevant that "there is no evidence to suggest that [the section 1983 plaintiff] was attempting to resist or evade arrest by flight"). Basim was then handcuffed and placed in the back of a police cruiser.

Considering the totality of the circumstances, there is little, if anything, in the record that would justify the officers' purported use of gratuitous force. In *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001), this Court held that officers acted unreasonably by placing handcuffs that were too tight on a plaintiff who had been stopped for committing a traffic violation. Here, the force was beyond the mere use of handcuffs. Additionally, in *Ciminillo*, this Court found it relevant that the section 1983 plaintiffs' "conduct demonstrated that he was not armed, and thus posed no threat to the officers' safety." 434 F.3d at 467; *see also Robinson v. Nolte*, 77 Fed. App'x 414, 414 (9th

Cir. 2003) (unpublished) (finding the use of deadly force to be objectively unreasonable against a visibly armed plaintiff who had his hands over his head in the 'surrender position'). Here, there was never any indication that Basim or his brothers were armed. Viewing the facts in the light most favorable to Basim, they do establish the use of excessive force.

Based on this conclusion, the Court should proceed to the second step of the qualified immunity analysis. Despite finding that the allegations establish a violation of a constitutional right, the defendants may still be entitled to qualified immunity if the right alleged to have been violated was not "clearly established" at the time of the stop. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held to be unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal citation omitted). Thus, this Court must determine whether it would have been clear to a reasonable officer in the Waterford officers' position that kicking Basim, holding a gun to his head, and kneeling on his neck, was unreasonable.

In our opinion, the unlawfulness of holding a gun to a suspect's head while berating him about his nationality is apparent. No reasonable officer in Lemos' position would think that what he was alleged to have done would be lawful. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances"). Moreover, in this Circuit, the law is clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized. *See Phelps v. Coy*, 286 F.3d 295,

301 (6th Cir. 2002) (finding "no governmental interest in continuing to beat Phelps after he had been neutralized, nor could a reasonable officer have thought there was"); *see also Bass v. Robinson*, 167 F.3d 1041 (6th Cir. 1999) (holding that force alleged to have been used would be unreasonable where plaintiff alleged that after complying with officer's orders, the officer attacked him verbally and physically, put him in a headlock, and slammed his head against a tree several times, resulting in injuries). Likewise, in *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994), this Court held that after a suspect was incapacitated by mace, the continued use of force, which involved continuing to spray mace on the incapacitated suspect, was excessive as a matter of law. In *McDowell v. Rogers*, 863 F.2d 1302 (6th Cir. 1988), this Court held that hitting a handcuffed suspect with a nightstick when the suspect was not resisting was gratuitous and unreasonable. Also, in *Darnell v. Caver*, 1998 WL 416000 (6th Cir. 1998) (unpublished), this Court held that it was unreasonable to lift a suspect's head and let it drop to the pavement after the suspect had been thrown to the ground. *See also Lewis v. Downs*, 774 F.2d 711 (6th Cir. 1985) (finding use of force to violate the Constitution — albeit wrongly analyzing under the Fourteenth Amendment's heightened standard — where police officers kicked a handcuffed woman and struck her husband and son with nightsticks in the course of arresting them).

Thus, with the facts viewed in the light most favorable to Basim, the officers inflicted force that was gratuitous and would have been recognized by a reasonable officer as excessive. Officers are and have been on notice that the use of gratuitous force against a detained and passive or non-resisting suspect violates the Constitution. No reasonable officer would have believed that he could

kick, kneel upon a suspect's neck, or hold a gun to a suspect's head when that suspect has shown

no sign of resistance, no sign of being armed or dangerous, and is already subdued.

## III.

We therefore AFFIRM the district court's decision denying summary judgment on the basis

of qualified immunity.