NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 14a0686n.06

No. 13-1807

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Sep 03, 2014
DEBORAH S. HUNT, Clerk

STEPHEN BOLICK, as Personal
Representative of the Estate of Matthew
Bolick, deceased,

    Plaintiff–Appellee,

    v.

CITY OF EAST GRAND RAPIDS, et al.,

    Defendants–Appellants.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

Before: SUTTON and GRIFFIN, Circuit Judges; and SARGUS, District Judge.[*]

**SARGUS, District Judge.** On November 16, 2009, two police officers from the City of East Grand Rapids responded to a call from Stephen Bolick. He reported that his son Matthew "was freaking out" and had threatened to kill him. The officers arrived at the scene and, after an intense struggle, had Matthew on his stomach in handcuffs. Viewing the facts in Matthew's favor, one officer then tased him and the other applied pressure to Matthew's back with both of his knees. Matthew died at the scene shortly thereafter. His family brought suit. The district court denied summary judgment on qualified immunity grounds for the post-handcuff tasing and back pressure, and dismissed qualified immunity as a defense altogether. We **AFFIRM** the denial of qualified immunity at summary judgment and **REVERSE** the dismissal of qualified immunity as a defense.

---

[*] The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

## I.

## A.

On the day he died, Matthew was thirty years old and living at his parents' house. By all accounts, he was going through a tough time. He had just stopped working at UPS and, according to Stephen, he had been acting strangely. For example, in the weeks leading up to his death, Matthew told Stephen that he had been hearing voices, that he was being watched by the Secret Service, and that he would soon go to New York by helicopter to throw out the first pitch at a Mets game.

Matthew's problems came to a head on the night in question. Stephen and one of Matthew's brothers, Kevin, arrived home to find the picture window in their dining room broken. Matthew stood outside and admitted to breaking it. After jumping back through the window, he ran outside and yelled at his dad to get into the house. Stephen and Kevin got into their car and left. Stephen called 911 as he drove away, telling the operator, "my son is freaking out, he's lost it, he has threatened me." R. 72-1 at 187.

East Grand Rapids Police Department Sergeant Brian Davis and officer Gary Parker were dispatched to deal with "a civil domestic" dispute where "the son was out of control." R. 67-1 at 41. Davis met Stephen at a nearby gas station. Stephen explained that Matthew "was delusional, hearing voices, had jumped through the window, [that he was concerned Matthew] was going to hurt himself," and that Matthew had threatened to kill him. R. 72-1 at 207.

While Stephen spoke with Davis, Parker made his way to Matthew's house. After talking to a neighbor who was in his car when Matthew ran up and pounded on the driver's-side window, Parker saw Matthew running around in the street. Matthew complied when Parker ordered him to stop running. When asked what he was running from, Matthew answered, "from

2

myself, man." R. 67-2 at 73. Parker thought Matthew seemed on edge and told him to "chill out." *Id.* Matthew did not, instead punching Parker in the face and running off. Parker followed and caught up, this time asking Matthew where he lived. Matthew pointed toward his house and then sucker punched Parker. Parker pulled out his taser and, after another exchange where Matthew did not follow directions, tased Matthew from five to ten feet away. Matthew stood back up. Parker tased him again. Parker testified that Matthew reached up, grabbed the taser wires with his bare hands, broke them off, and kept running. Parker gave chase. Davis, who had arrived by this time, joined. Both tried unsuccessfully to tase Matthew as he ran home.

The chase ended in Matthew's kitchen. Matthew ignored commands to get down, instead crouching into a fighting position and then making his way to the sink. The officers noticed a nearby set of knives and they repeated their commands. Matthew then turned around, walked toward the kitchen trash can, and reached into it. Davis kicked the trash can over and things escalated. Matthew ran at Parker and punched him in the chest; Parker tased Matthew at close range (known as drive stunning, according to Parker). At the same time, Davis wrestled Matthew to the ground and the officers tried to get Matthew in handcuffs. Matthew was 5'4", 128 pounds at the time; the record does not reflect Parker's size; Davis is 5'10" and estimated that he weighed 210 pounds at the time. Despite the size difference and despite outnumbering Matthew, the officers testified that Matthew put up significant resistance. The officers cuffed Matthew's right hand but had to continue to fight to get his left hand behind his back. Parker drive stunned Matthew again on his side. At this point, he and Davis were able to get Matthew's other hand in cuffs. With Matthew in handcuffs and on his stomach, the officers radioed for backup.

The district court assumed—and the parties do not dispute—that Parker tased Matthew after Matthew had been handcuffed but before backup arrived. *See* R. 97 at 22; R. 67-2 at 123. As the officers tell it, they had significant difficulty controlling Matthew even after they had him handcuffed on his stomach. They testified that Matthew's strength and continued resistance prompted them to take halves, with Parker using his body to straddle Matthew's ankles and Davis up toward Matthew's back. Davis testified that he used his hands and knees (at different times)—but not the full weight of his body—to put pressure on Matthew's shoulders. Despite trying to control him, the officers testified that Matthew repeatedly tried to buck them and almost succeeded in doing so; and that he tried to grab the officers with his hands even though he was in cuffs. As they remember it, Matthew resisted their control on and off for roughly ten minutes before backup arrived.

Matthew's brothers Kevin and Jonathan tell a different version. They had made their way back to the house by this time (after Matthew was in handcuffs and before backup arrived) and saw some of Matthew's encounter with the officers on the ground. Kevin testified that he watched the encounter for about five minutes. He heard Matthew scream three times and the officers tell Matthew to stop resisting once. As he saw it, one of the officers held Matthew's head down and officer Davis applied pressure to Matthew's back with both knees and the full weight of his body. He also testified that Matthew moved his legs "back and forth" off of the ground and raised them up a matter of "[i]nches." R 72-2 at 108. Jonathan's testimony largely mirrored Kevin's. He said he saw Davis put both knees and arms into Matthew's back, and that he saw one of the officers tase Matthew in his back. When asked whether Matthew made kicking motions, Jonathan said, "[h]is feet shuffled slowly, but not kicking at [sic] any means."

4

R. 72-3 at 82. When asked again whether Matthew struggled, Jonathan said his "feet shuffled" and "slid across the ground" but that Matthew "couldn't move." *Id.* at 84.

Several officers who showed up to relieve Davis and Parker restrained Matthew in a similar manner (one high, one low). They testified that Matthew continued to struggle. One of the officers asked Matthew twice if he was okay. Matthew grumbled the first time and did not respond the second. EMS personnel on the scene rolled Matthew over. His eyes were half open and glassy, and the color had drained from his face. The EMS personnel tried to resuscitate him, but Matthew was pronounced dead at the scene soon thereafter. The autopsy report cites exhaustive mania—also known as excited delirium syndrome—as the official cause of death.

**B.**

Matthew's family brought suit against East Grand Rapids, Davis, and Parker. Relevant to this appeal, they alleged excessive force against Davis and Parker in violation of the Fourth (and Fourteenth) Amendment. They also brought a failure-to-train claim against East Grand Rapids and its director of public safety under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The district court granted partial summary judgment to the defendants on the failure-to-train claims. Viewing the record in Matthew's favor, the district court held that genuine issues of material fact as to the officers' post-handcuff tasing and back pressure required denial of qualified immunity at summary judgment. The court then dismissed qualified immunity as a defense. The officers bring an interlocutory appeal of the denial and dismissal of qualified immunity.

**II.**

According to the officers, it is uncontested that Matthew resisted them (mightily) after being placed in handcuffs on his stomach. Even if he were not resisting, they argue, all that

matters is that a reasonable officer in their position would have interpreted Matthew's actions as resistance, thus justifying their force.

## A.

"[U]nder either [qualified-immunity] prong, courts may not resolve genuine disputes of fact in favor of the party"—here, the officers—"seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Instead, if "there is disagreement about the facts, . . . we must review the evidence in the light most favorable to the Plaintiff[], taking all inferences in [his] favor." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004); *see also Tolan*, 134 S. Ct. at 1865 (the first qualified-immunity question "asks whether the facts, [*t*]*aken in the light most favorable to the party asserting the injury*, . . . show the officer's conduct violated a [federal] right" (alterations in original) (emphasis added) (internal quotation marks omitted)).

In turning to this case and reading the record in Matthew's favor, Matthew did not resist the officers after he was handcuffed. The district court assumed as much, *see* R. 97 at 28, and our own view of the record—in Matthew's favor—leads us to the same conclusion. Kevin and Jonathan watched as the officers subdued Matthew. Kevin testified that the officers held Matthew's head down and that Matthew could only move his legs off of the ground a matter of inches. *See* R. 72-2 at 107–08. Jonathan testified that he did not see Matthew try to buck the officers off, *see* R. 72-3 at 82; that Matthew's feet "shuffled slowly," but that he was "not kicking [by] any means," *id.*; and, when asked whether Matthew struggled against the officers, that Matthew's "feet shuffled" and "slid across the ground," but that Matthew still "couldn't move," *id.* at 84.

6

**B.**

The officers contend that a reasonable officer would have interpreted Matthew's actions as active resistance. [1] We have jurisdiction when a defendant appeals the "denial of a claim of qualified immunity," *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), but the scope of our jurisdiction is narrow. We may only review the denial of qualified immunity based purely on issues of law, *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006), meaning the officers must accept "the plaintiff's facts, taken at their best," *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999); *see Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) ("[Where] the defendant disputes the plaintiff's . . . story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal."). In other words, we do not have jurisdiction insofar as the officers solely contest "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 320 (1995). But if, "aside from the impermissible arguments regarding disputes of fact, the defendant also raises the purely legal question of whether" he is due qualified immunity under "the facts alleged" in the plaintiff's favor, "then . . . this court has jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (citation omitted) (internal quotation marks omitted).

**III.**

The officers in this case appeal the denial of qualified immunity as to two discrete police actions against Matthew on the night of his death: Parker's alleged use of a taser while Matthew lay handcuffed on his stomach, and Davis's alleged pressure against Matthew's back under the same circumstances. We review the denial of qualified immunity *de novo*, *McCullum v. Tepe*, 693 F.3d 696, 699 (6th Cir. 2012), and ask two questions in doing so: first, whether the officers

---

[1] The camera on officer Parker's taser recorded video of the encounter in the kitchen. Much of the video came from the vantage point of the taser placed on the floor next to Matthew's body. The video does not resolve the parties' factual dispute (as to whether and what extent Matthew struggled).

violated the plaintiff's constitutional right, and second, whether that constitutional right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If, viewing the facts in the plaintiff's favor, the answer to both questions is yes, qualified immunity does not shield the officers from trial. *See McCullum*, 693 F.3d at 699. We address the questions in sequence.

## A.

The Fourth Amendment protects citizens from unreasonable seizures. The parties do not dispute that Matthew had been seized within the meaning of the Fourth Amendment at the time of the actions in question; they do dispute whether the post-handcuff tasing and back pressure amounted to excessive—and thus unreasonable—force under the circumstances. According to the reasonableness inquiry, we ask "whether the totality of the circumstances justifie[d]" the officers' actions, *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013), and we view the facts and circumstances "from the perspective of a reasonable officer on the scene" in doing so, *Graham v. Connor*, 490 U.S. 386, 396 (1989).

*Graham v. Connor* provides guidance for the reasonableness inquiry in excessive-force cases. We must undertake "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U.S. at 396 (internal quotation marks omitted). Although the reasonableness test is "not capable of precise definition or mechanical application," several factors assist in the balancing: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *see also Champion*, 380 F.3d at 904 (noting that it "must be

8

considered" in the reasonableness analysis "[w]here it is or should be apparent to the officers that the individual involved is emotionally disturbed").

The first *Graham* factor requires a closer look at the timeline in this case. To be sure, the crimes Matthew allegedly committed—assaulting a police officer and threatening to kill his father—justified force in apprehending him. The officers used force commensurate with those crimes in trying to handcuff him: they deployed their tasers several times and Parker held Matthew's legs so he could not run away or fight back. The district court accordingly granted the officers qualified immunity for those actions. But those actions are not before us. We must assume Matthew was in handcuffs on his stomach and that he could barely move. Because we must assume that Matthew had been apprehended and did not actively resist the officers at the time of the actions at issue, this factor tilts in Matthew's favor.

Viewing the facts in Matthew's favor brings clarity to the second and third factors (whether Matthew posed a threat and whether Matthew attempted to resist arrest). In this view, a reasonable jury could find the following facts by the time Parker drive stunned Matthew and Davis put his knees into Matthew's back: Matthew could hardly move, had stopped resisting, and was outnumbered, all with one of the officers (Davis, who was six inches taller and 80 pounds heavier) applying significant pressure to his upper back. The second and third *Graham* factors thus also favor Matthew.

Working through these factors brings us to the ultimate question of whether the totality of the circumstances justified the seizure. Based on the *Graham* factors, "[t]he bottom line is that a [reasonable] jury could find that the officers' conduct was unreasonable." *Martin*, 712 F.3d at 960. Yes, Matthew assaulted Parker and attempted to evade arrest. But, taking the facts in his favor, Matthew could barely move, had stopped resisting, was under control, and thus posed little

risk to himself or anyone else by the time he was in handcuffs—at which point Parker tased him and Davis (who knew Matthew suffered from a diminished mental state) put the weight of his body into Matthew's upper back. For these reasons, a reasonable jury could conclude that the officers' post-handcuff actions were not calibrated to the threat Matthew posed, and thus were objectively unreasonable uses of force.

"The facts and circumstances of other recent excessive force cases" may "guide our [reasonableness] inquiry." *Roberts v. Manigold*, 240 F. App'x 675, 677 (6th Cir. 2007). Those cases support our conclusion. *See Martin*, 712 F.3d at 960 ("The quantum of force the officers used was constitutionally excessive, violating the Fourth Amendment right of an unarmed, minimally threatening, and mentally unstable individual to be free from gratuitous violence during an arrest."); *Bultema v. Benzie Cnty.*, 146 F. App'x 28, 35 (6th Cir. 2005) ("[T]he gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional."); *Champion*, 380 F.3d at 901 (excessive for police officers to "lay on top of" an arrestee "who had stopped resisting arrest and posed no flight risk, and [then] spray[] him with pepper spray even after he was immobilized by handcuffs and a hobbling device").

The officers contend that the district court undertook an improper analysis by analyzing each factor as a discrete part of the reasonableness inquiry. While the officers properly point out that "totality of the circumstances" is the correct test in this case, they fail to explain how the district court did not adhere to this test. The district court did analyze each *Graham* factor as a discrete point, but it did so before addressing—and as part of the analysis that helped answer— the ultimate totality-of-the circumstances question. We have also undertaken a similar form of analysis in other cases, *see, e.g.*, *Martin*, 912 F.3d at 758–60, and the officers do not cite any cases to show that this form of analysis amounts to error. Further, we review the issue *de novo*

and are not bound to follow the district court's analysis. Our *de novo* review of the excessive-force claim results in the same conclusion the district court reached.

**B.**

Qualified immunity protects officers "from the sometimes hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (internal quotation marks omitted). The second part of the qualified-immunity inquiry accordingly thus asks whether, at the time of the challenged conduct, "[t]he contours of the right" allegedly violated were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This depends on whether the unlawfulness of the officers' conduct was apparent "in the light of pre-existing law." *Id.*; *see Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002) (Pre-existing law refers "first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.").

Before answering this question, we must define the rights at issue "at the appropriate level of generality—a reasonably particularized one." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012); *see id.* at 508–09 ("If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas)."). We thus ask: whether it was clearly established in November 2009 that it was excessive for an officer to apply the weight of his body to the back of a handcuffed suspect who did not resist, all while the suspect lay on his stomach with another officer controlling his legs; and whether it was excessive for an officer to tase the arrestee in drive-stun mode under the same circumstances.

11

The answer to both questions is yes. As to Davis's conduct, we have several times held that the application of pressure to a handcuffed suspect on his stomach violates clearly established law. For example, in *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004), we confronted the same question when officers "lay on top of" an arrestee "who had stopped resisting arrest and posed no flight risk, and sprayed him with pepper spray even after he was immobilized by handcuffs and a hobbling device." As we held then, in 2004, "it [is] clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Id.* at 903; *Martin*, 712 F.3d at 961 ("The prohibition against placing weight on [an arrestee's] body *after* he was handcuffed was clearly established in the Sixth Circuit as of August 2007."). In short, a reasonable officer in Davis's position would have known based on clearly established law that it was excessive to apply pressure to Matthew's back with both knees and the weight of his body while Matthew was handcuffed on his stomach and could barely move.

*Champion* also applies to Parker's use of the taser in drive-stun mode. To be sure, *Champion* addressed the use of pepper spray (not a taser) on a hobbled and handcuffed suspect. But the *Champion* court did note that, as of 2004, we had "consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right." *Champion*, 380 F.3d at 902. Here, if it was "clearly established that the Officers' use of pepper spray against [an arrestee] after he was handcuffed and hobbled was excessive," *id.* at 903, it was clearly established that Parker's tasing of Matthew under substantially similar conditions was also excessive. Several other pre-2009 cases reinforce this conclusion. *See, e.g.*, *Landis v. Baker*, 297 F. App'x 453, 464 (6th Cir. 2008) (clearly established that tasing "a suspect . . . surrounded by officers, in a prone position" and not even

12

fully handcuffed was unconstitutional); *Roberts*, 240 F. App'x at 677 (where one officer pinned a suspect down and the other tased him, "[t]he gratuitous use of force on a suspect . . . already . . . subdued and placed in handcuffs [was] unconstitutional").

The officers counter that not every reasonable officer in their position would have understood that Matthew did not struggle or resist. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (violation of clearly established law when the right is "sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right" (emphasis added) (internal quotation marks omitted)). Again, this argument asks us to view the facts in a light most favorable to the officers, which we cannot do. A view of the record in Matthew's favor (which shows that he was barely able to move and did not resist) controls our analysis, not one that considers whether every reasonable officer would have acted differently under a situation drawn more in their favor. For this reason, the facts of the cases the officers cite are easily distinguishable from those here. *See Hagans*, 695 F.3d at 507 (use of force before the suspect was handcuffed and while he actively resisted arrest); *Humphrey v. Mabry*, 482 F.3d 840, 850–51 (6th Cir. 2007) (officers acted reasonably when they used force after relying on officer-to-officer information that turned out to be wrong); *Goodrich v. Everett*, 193 F. App'x 551, 556 (6th Cir. 2006) (use of force occurred before the plaintiff was under the officers' control).

## IV.

This leaves the question of whether the officers' qualified-immunity defense should have been dismissed. For the sake of context, the officers moved for summary judgment based on qualified immunity, and Mr. Bolick moved for summary judgment requesting dismissal of qualified immunity as a defense. As we have explained, and as our holding now confirms, the

13

district court held that genuine issues of material fact required denial of the officers' motion regarding their use of post-handcuff force. Despite finding genuine issues of material fact, the district court granted Mr. Bolick's request to dismiss qualified immunity as a defense. We review the matter *de novo*, *see McCullum*, 693 F.3d at 699, and we reverse.

Qualified immunity acts both as a shield from trial, *see Mitchell*, 472 U.S. at 525, and as a defense to liability on the merits, *see Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986) ("*Mitchell* makes it clear that the immunity doctrines' protections against liability and against the various burdens of litigating insubstantial claims are conceptually distinct."). Accordingly, our cases confirm that an official denied qualified immunity at summary judgment because of an issue of fact can re-raise the defense at trial. *Id.* ("[D]ecisions with respect to dismissal or summary judgment, [even] if adverse, do not preclude the interposition of the defense of immunity as a defense to liability on the merits."); *see Champion*, 380 F.3d at 898–99 (police-officer defendants asserted the defense at trial after being denied qualified immunity at summary judgment); *see also Ortiz v. Jordan*, 131 S. Ct. 884, 889 (2011) ("[O]nce trial has been had, however, the availability of official immunity should be determined by the trial record, not the . . . summary judgment record." (alteration in original) (internal quotation marks omitted)).

In this case, even though the district court declined to grant summary judgment to the officers based on qualified immunity, it improperly dismissed qualified immunity as a defense. Reinforcing our conclusion is the fact that the officers complied with the only requirement necessary for them to invoke the defense at trial: raising qualified immunity as an affirmative defense from the outset. *See Kennedy*, 797 F.2d at 300 ("Since immunity must be affirmatively pleaded . . . . we conceive it possible that one might assert immunity as an affirmative defense to the complaint and thus as an affirmative defense to ultimate liability without putting in issue his

14

or her right to be free of subjection to trial . . . .").  We thus reverse the district court's decision to dismiss qualified immunity as a defense to the police actions that remain at issue.

## V.

For the reasons stated, we affirm in part and reverse in part.