BOGGS, Circuit Judge.
When reporting to the scene of suspected drug activity, Deputies Sean Urban and Thomas Mercure approached Stanley Jackson to ask him questions regarding his potential involvement. Upon seeing the officers, Jackson turned and ran into his mother’s house, followed by Deputy Urban. Soon after, other officers entered the house. In the course of his arrest and an attendant struggle, Jackson was tased four times. Once handcuffed, Jackson was taken to a hospital by ambulance, where he died shortly after being administered a sedative. Plaintiff Pearlie Jackson, Jackson’s mother and personal representative of his estate, brought this action against Washte-naw County and Deputies Thomas Mer-cure, Dean Rich, Sean Urban, and Holly Farmer under 42 U.S.C. § 1983 for excessive force in violation of the Fourth and Fourteenth Amendments and under Michigan tort law for gross negligence, willful and wanton misconduct, assault, battery, and intentional infliction of emotional distress. The district court granted Defendants’ motion for summary judgment on the § 1983 claim on the basis of qualified immunity and declined to exercise jurisdiction over the state-law claims.
Plaintiff appeals the grant of summary judgment, contending that there is a genuine issue of material fact as to whether Defendants’ use of force against Jackson was objectively reasonable. Because we find that Plaintiff produced no evidence creating such a dispute, we AFFIRM the district court’s grant of summary judgment.
*304 I
On August 20, 2010, Detective Michael Marocco was engaged in a drug investigation of Stanley Jackson (“Jackson”) in Superior Township, Michigan. Marocco was parked down the street from where Jackson was standing in his mother’s driveway and the detective observed various persons approach Jackson. On two occasions, Jackson removed an object from his pants and handed it to his visitor. After the second interaction, Marocco contacted Deputy Sean Urban and advised him to make contact with Jackson and the other man. Deputies Urban and Mercure arrived on the scene in uniform and approached the two men. Deputy Urban was wearing a body microphone, the audio of which was transcribed. Urban asked Jackson, “Hey, what’s going on partner? Come here a second.” Jackson clutched his waistband and began backing away toward the garage, saying “I didn’t do it man.” Urban commanded Jackson to stop, but he turned and ran into his mother’s house, repeating “I did not do it, man.” While Jackson fled, Urban observed that he kept his hands near his waistband.
Urban pursued him into the house, un-holstered his Taser, and warned him, “Stop. I’ll tase you.” In the kitchen, Jackson stopped and turned around, and Urban, allegedly fearing Jackson would pull a weapon from his waistband, fired his Taser in probe mode.[1] Struck by the probes, Jackson fell to the floor (Taser No. 1). Urban repeatedly ordered Jackson to put his hands behind his back, but his muscles were rigid as a result of the Taser and Urban was unable to pull his arms around to handcuff him. Mercure entered the house and handcuffed one of Jackson’s wrists while Urban separately handcuffed the other. The deputies then realized that Jackson was not blinking, had his eyes and jaw locked, and had begun to salivate. Mercure called for an ambulance to arrive urgently and the two deputies asked Jackson if he was all right and told him to relax. Jackson started to move once again and pulled his hands away from his back. Using “muscling techniques,” the deputies attempted to bring Jackson’s wrists near enough together to handcuff them to each other, while Jackson shouted incoherently and struggled. Mercure unholstered his Taser, and Urban warned, “Stop resisting. I’m gonna [sic] tase you again.” Mercure tased Jackson on his upper back[2] for three seconds (Taser No. 2), but did not observe any effect on Jackson.
Deputy Holly Farmer arrived and assisted Urban and Mercure in trying to bring Jackson’s arms together, but the three officers and Jackson rolled on the floor in the attempt. The deputies ordered Jackson to turn on his stomach, and Mer-cure unholstered his Taser once more. *305 Jackson was turned onto his stomach as Mercure went to tase him and the Taser was discharged for five seconds (Taser No. 3).[3] While Jackson pulled and kicked, Farmer’s arm became trapped between Jackson’s head and arm. Farmer saw Jackson open his mouth and bring it to her arm as if to bite it. When he made contact, Fanner punched Jackson in the jaw and yelled, “Don’t bite.” While this occurred, Deputy Dean Reich arrived and attempted to assist in restraining Jackson by securing his legs to prevent him from turning over. Urban and Reich secured Jackson’s left arm to his belt using the handcuffs on Jackson’s left wrist. Jackson continued to struggle using his right arm despite repeated orders from Urban: “Get your hands behind your back. L[ie] down.” Urban then tased Jackson for five seconds (Taser No. 4).
The deputies pulled Jackson’s right wrist behind him and handcuffed it to the pair of handcuffs on Jackson’s left wrist. Jackson continued to twist about, spitting and yelling, “Get off me.” Jackson was searched and no weapon was found on him, although a plastic bag with cocaine was found in his waistband, money was found in his front pocket, and a Michigan Department of Corrections tether on his ankle.
When paramedics arrived, they put a disconnected oxygen mask on Jackson to prevent him from spitting on them. After the mask was removed to take his picture, Jackson spat at Urban’s face and continued to struggle against his restraints in the ambulance, preventing paramedics from fully checking his condition. Upon arrival at the hospital, he continued to be “extremely agitated,” and spat at doctors in the emergency room. Hospital records state that because Jackson was combative, security personnel were summoned and placed restraints on him. Although doctors reported his breathing as unlabored, Jackson repeatedly stated that he could not breathe. To calm Jackson, a physician prescribed 2 mg of Ativan (lorazepam), which was administered and caused him to relax. But after two minutes, Jackson went limp and doctors could not find a pulse. Jackson was pronounced dead after doctors were unable to resuscitate him. The reported cause of death on the autopsy was listed as cardiac arrest from nonocclusive ischemic heart disease associated with acute adre-nergic stress reaction, with the Taser application recorded as a potential contributor to stress.
II
A. Standard of Review
We review a district court’s grant of summary judgment de novo. Mullins v. Cyranek, 805 F.3d 760, 764 (6th Cir. 2015). A motion for summary judgment should be granted where “there is no genuine dispute as to any material fact and the mov-ant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). “A genuine issue of material fact exists when, assuming the truth of the non-moving party’s evidence and construing all inferences from that evidence in the light most favorable to the non-móving party, there is sufficient evidence for a trier of fact to find for that party.” Gradisher v. City of Akron, 794 F.3d 574, 582 (6th Cir. 2015) (quoting Murray-Ruhl v. Passinault, 246 Fed.Appx. 338, 342 (6th Cir. 2007)).
A claim under 42 U.S.C. § 1983 requires that a plaintiff allege that he was deprived of a federal right by someone acting under *306 color of state or territorial law. Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). When government officials perform discretionary functions, they are entitled to a qualified immunity and are shielded from suit where “their actions could reasonably have been thought consistent with the rights they are alleged to have violated.” Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); see also Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).
B. Analysis
The Fourth Amendment enshrines the people’s right to freedom from unreasonable seizures. The use of force by police officers will constitute a seizure, and force that is “ ‘objectively [unreasonable’ in light of the facts and circumstances confronting” officers violates a federal right. Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Courts endeavor to analyze “reasonableness at the moment” the force was used, “rather than with the 20/20 vision of hindsight.” Id. at 396, 109 S.Ct. 1865. In examining the use of force by an officer, we consider “the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Hayden v. Green, 640 F.3d 150, 153 (6th Cir. 2011) (quoting Smoak v. Hall, 460 F.3d 768, 783 (6th Cir. 2006)).
The question in this case is whether Jackson was actively resisting arrest. Plaintiff asserts that Defendants used unreasonable force when they tased Jackson four times and punched him in the face because he was “neutralized” and had “submitted to [police] authority when he sustained his injuries.” We have long distinguished active resistance by arrestees from passive resistance. See Goodwin v. City of Painesville, 781 F.3d 314, 323 (6th Cir. 2015). The former can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders. See ibid.; Rudlaff v. Gillispie, 791 F.3d 638, 641 (6th Cir. 2015). The latter is generally shown by the lack of physical resistance or verbal antagonism. See Austin v. Redford Twp. Police Dep’t, 690 F.3d 490, 498 (6th Cir. 2012); Eldridge v. City of Warren, 533 Fed.Appx. 529, 535 (6th Cir. 2013). “When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.” Rudlaff, 791 F.3d at 642.
Because each tasing or punch can be a separate constitutional violation, we analyze them in turn. The first Taser application occurred after Jackson had fled into his mother’s home, ignoring Urban’s commands to stop. Suddenly, once in the house, he stopped and turned with his hand by his waistband. Where a suspect has refused to follow police orders and may be in possession of a weapon, we have determined there is no clearly established right to resist that can defeat qualified immunity. See Watson v. City of Marysville, 518 Fed.Appx. 390, 393 (6th Cir. 2013); see also McGee v. City of Cincinnati Police Dep’t, No. 1:06-cv-726, 2007 WL 1169374, at *6 (S.D. Ohio Apr. 18, 2007). While Jackson was in one sense complying with Urban’s command to stop, his further turning around with his hand by his waist presented itself as an immediate threat to the officer. And though it became clear after all four tasings that Jackson was unarmed, we must make “allowance for the fact that police officers are often forced to make split-second judgments” regarding their safety and that of others. Graham, 490 U.S. at 397, 109 S.Ct. 1865. Immedi *307 ately prior to this moment, Jackson had been in the process of selling cocaine and other drugs, which have a “well recognized nexus” with firearms, see, e.g,, United States v. Golter, 880 F.2d 91, 94 (8th Cir. 1989), and the investigation had received a report that Jackson frequently kept a .88-caliber weapon with him during deals. Given these factors and the immediacy of the potential danger to Urban, we cannot say that the first Taser deployment- violated a clearly established right.
The second tasing occurred just under four minutes later. After Jackson was struck by the first Taser in probe mode, he crumpled to the ground. Urban and Mer-cure attempted to secure his arms, but his muscles were tense and they were unable to link the handcuffs on each wrist. It became apparent to them that Jackson was in some distress, as he was not moving his eyes and had his arms locked from the Taser’s shock. The officers began asking Jackson if he was all right, telling him to relax, and that help was on the way. About two minutes and forty-five seconds after the tasing, however, Jackson began moving again and wrestling with the officers. After a warning that continued resistance would result in another tasing, Mercure used his Taser on Jackson. It is clear that if Jackson were flailing or resisting solely as a result of the initial Taser shock and this was apparent to officers, they would then be in violation of Jackson’s constitutional rights. In Goodwin, we found a violation of clearly established rights where a man was tased again for “resisting” where he was “obviously convulsing” from the effects of a Taser deployed seconds earlier. 781 F.3d at 327. But in Wysong v. City of Heath, 260 Fed.Appx. 848 (6th Cir. 2008), we held that resistance by a man suffering a hypoglycemic attack could constitute active resistance where officers were not aware the man was in diabetic shock and the man testified he could not remember what transpired. Id. at 856-57.
Here, the initial tasering had a demonstrable effect on Jackson: his muscles contracted to the extent that the deputies could not move his arms, his jaw locked, and his eyes stared unblinking straight ahead. Any alleged resistance during this stage would have been due to the shock and any tasing would be unreasonable. But the police did not tase Jackson during this time; although they initially were prepared to tase Jackson again for failure to present his arms, they stopped once they realized he was unable to move on his own. The deputies attempted to calm Jackson and make sure that he was medically stable. It was when Jackson appeared to recover and began to “come out of his condition,” pulling his arms toward his stomach and waist and away from the deputies, that Mercure tased Jackson again. We have held that a failure to present one’s arms to an officer upon request without more is at most passive resistance, but that a physical struggle to maintain control of one’s limbs while being placed in handcuffs can be active resistance. Compare Griffith v. Coburn, 473 F.3d 650 (6th Cir. 2007), and Eldridge, 533 Fed.Appx. at 535 (“[N]on-compliance alone does not indicate active resistance....”), with Caie v. West Bloomfield Township, 485 Fed.Appx. 92 (6th Cir. 2012); see also Rudlaff, 791 F.3d at 643 (“[P]olice officers can tase someone who resists lawful arrest and refuses to move his hands so the police can handcuff him.”). Even in Goodwin we acknowledged that “resistfing] arrest by ‘laying down ... and deliberately locking [one’s] arms together tightly under [one’s] body while kicking and screaming” was active resistance. Goodwin, 781 F.3d at 326 (quoting Eldridge, 533 Fed.Appx. at 534).
Based on the evidence before us, a reasonable officer on the scene could have *308 believed that Jackson was actively resisting and no longer suffering from the Ta-ser-induced shock. Although we assume the truth of the non-moving party’s evidence, as the district court below noted, Plaintiff submitted no “other witnesses’ statements to the contrary” and “[t]he expert reports ... do not go to whether Mr. Jackson was resisting at the time he was arrested.”[4] The closest evidence that Plaintiff provides is her expert’s report that states “Mr. Jackson was struggling for his life, not against the deputies” and that a “person being Tased thrashes around from pain and the inability to breath[e].” That report relies entirely on the police and hospital reports for its factual basis, and cannot create new evidence from the old. It can, of course, suggest the best reading of that evidence for Plaintiff that we may adopt when reviewing a motion for summary judgment, but conclusory statements are insufficient. Jackson’s initial physical reaction to the Taser was to lock up and become immobile. The deputies realized that this state was a result of the tasing and reacted sympathetically and helpfully. But when Jackson’s status changed and he began to pull against their grip to bring his arms forward, the deputies believed that he had “[rejgained control of himself.” Then, minutes later, Jackson began to “thrash[ ] around.” If Jackson was still, or once again, reacting to the shock of the first Taser, it would not have been “objectively apparent to a reasonable observer.” Goodwin, 781 F.3d at 324.
The third tasing took place fifteen seconds later, after continued struggling on the floor. The record before us shows that the Taser was used contemporaneously with Jackson being rolled onto his stomach. Unfortunately, Jackson is not available to provide his account, which may or may not have differed from that in the police reports and the audio tape. We have found in other cases that the accounts of the plaintiff or a witness can sustain a case beyond summary judgment where a court might have been compelled to grant qualified immunity based solely on the facts given by the reporting officers. See, e.g., Bolick v. City of East Grand Rapids, 580 Fed.Appx. 314 (6th Cir. 2014); Griffith, 473 F.3d 650. But based on the facts provided, even in the light most favorable to Plaintiff, we cannot say that the force used was unreasonable. As noted above, “officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.” Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The deputies attempting to restrain Jackson found that the second tasing had been ineffective in stopping Jackson from resisting them efforts to handcuff him. Viewing the situation as Mercure tased Jackson again, if in fact Jackson was no longer resisting, or was complying with police commands, as opposed to continuing to struggle to break free, that would not have been apparent to a reasonable officer.
Shortly after this Taser use, Jackson moved his head toward Farmer’s trapped arm and attempted to bite her. She punched Jackson in the jaw to prevent the bite. Farmer’s actions were reasonable given there existed probable cause to believe that harm was imminently threatened. See Chappell v. City of Cleveland, 585 F.3d 901, 911 (6th Cir. 2009).
The fourth and final use of a Taser came just over a minute after the third tasing. By this time, the deputies had man *309 aged to secure one of Jackson’s hands by handcuffing it to his belt. But Jackson continued to pull away from the deputies. Urban tased Jackson again before Farmer and Reich were able to handcuff Jackson’s right arm to the other pair of handcuffs on his left arm. We have found that where resistance continues, repeated attempts to induce compliance are permissible. See, e.g., Williams v. Sandel, 433 Fed.Appx. 353 (6th Cir. 2011) (providing qualified immunity to officers who tased a man thirty-eight times while he continued to resist and evade arrest); Williams v. Ingham, 373 Fed.Appx. 542, 548 (6th Cir. 2010). Thus, there is no genuine issue of material fact that the actions taken by Defendants were reasonable responses to the resistance (real or perceived) made by Jackson, we affirm the district court’s grant of qualified immunity.[5]
Given Defendants’ entitlement to qualified immunity on the § 1983 claims, the district court did not err in declining to exercise jurisdiction over the supplemental state-law claims. “Generally, once a federal court has dismissed a plaintiffs federal law claim, it should not reach state law claims.” Sussman v. Dalton, 552 Fed.Appx. 488, 493 (6th Cir. 2014); see also Rouster v. Cty. of Saginaw, 749 F.3d 437, 454 (6th Cir. 2014).
III
Based on the foregoing, we AFFIRM the district court’s grant of summary judgment as to the excessive-force claim against the individual Defendants[6] and its dismissal of the remaining state-law claims.

. The Taser at issue here (a TASER X26) has two modes of use: probe mode, which fires probes into the target’s skin and thereby shocks him, and drive-stun mode, which involves the application of two electrode contacts onto a target and the running of a current between them. A shock via probes can override the central nervous system, while a shock in drive-stun mode administers localized pain and will not override the nervous system. See Cockrell v. City of Cincinnati, 468 Fed.Appx. 491, 492 (6th Cir. 2012).

. Although the police reports indicated that the deputies used drive-stun mode for the ensuing uses of their Tasers, Plaintiff argues through her expert that probe mode (the more painful and incapacitating mode) was used for at least two if not all of the discharges. In reviewing the record on appeal from summary judgment, we adopt the plaintiff's version of facts unless blatantly contradicted by the record. See Scott v. Harris, 550 U.S. 372, 378-80, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Because it is plausible from the face of the record, we will assume at least two of the discharges were in probe mode.

. Defendants contend that it is unclear whether this discharge actually contacted Jackson, but for the purposes of this appeal, we assume the third shock did contact Jackson. See Appellant’s Br. 3 ("Stanley Jackson ... was tasered no [fewer] than four (4) times.... ”).

. The pertinent portions of the record before us are an audio transcript of the entire interaction between Jackson and the officers, and the officers' testimony, nothing else.

. We note that Plaintiff produced no evidence that multiple tasings create an unreasonable risk of harm.

. Plaintiff failed to brief her municipal-liability claim, so her claim against Washtenaw County has been forfeited. See Wright v. Knox Cty. Bd. of Educ., 23 Fed.Appx, 519 (6th Cir. 2001).