NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0060n.06

Case No. 17-1513

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>JOSEPH FLANIGAN,</td><td>)</td><td rowspan="14"><strong>FILED</strong><br>Feb 05, 2018<br>DEBORAH S. HUNT, Clerk</td></tr>
</table>

JOSEPH FLANIGAN, )

    Plaintiff-Appellee, )

v. )

SCOTT PANIN, )

    Defendant-Appellant. )

**FILED**
Feb 05, 2018
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

---

BEFORE: SILER, KETHLEDGE, and THAPAR, Circuit Judges.

**SILER**, Circuit Judge. In this excessive-force action, Scott Panin, an Oakland County, Michigan sheriff's deputy, challenges the district court's partial denial of his motion for summary judgment. On appeal, Panin argues that the district court erred by denying him qualified immunity and by finding Flanigan's claim is not barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). For the following reasons, we AFFIRM.

I.

Flanigan's excessive-force claim against Panin arises from his arrest by Panin.[1] On the morning of the incident, Flanigan was walking in Clarkston, Michigan. Around that time, Panin

---

[1] The following description of the facts is primarily drawn from Flanigan's brief. Panin states that he "stipulates completely to Flanigan's version of events for purposes of this appeal."

received a dispatch call about a suspicious person. Nothing in the dispatch call indicated that the suspicious person was assaultive.

While Flanigan was walking, Panin stopped him and told him to freeze. Panin came within ten to twenty feet of Flanigan, but he had not said anything when Flanigan turned and started to walk away. Flanigan believed that, because he had done nothing wrong, he did not need to stay and talk with Panin. Panin then asked Flanigan to come speak with him and Flanigan "began to slightly engage in conversation" with Panin. However, after Flanigan did not give Panin his name, Panin told Flanigan that he would be handcuffed.

A foot chase ensued. During the course of events, Panin tased Flanigan twice. Flanigan thought he had gotten away from Panin when he made it to the backyard of a friend's house, but Panin soon caught up. Flanigan was lying on the ground when Panin appeared. Panin then maced Flanigan and hit him in the head fifteen to twenty times before placing him in handcuffs.

Panin insists that Flanigan continued to struggle until Panin placed him in handcuffs, but Flanigan asserts that he never tried to fight Panin. And although Flanigan acknowledges that he tried to stand up, he contends that was the moment when "Panin socked him in the head and smacked him in the head multiple times."[2] No force was used against Flanigan after he was placed in handcuffs.

Flanigan pled guilty to two charges stemming from the incident: possession of marijuana and a violation of Michigan Compiled Laws § 750.81d(1), which makes it a felony to assault, batter, wound, resist, obstruct, oppose, or endanger a person who the individual knows or has

---

[2] "Panin concedes Flanigan's version of events (including Flanigan's claim that Panin 'socked him' 10-15 times in the head) prior to the time the handcuffs were put on for purposes of this appeal."

reason to know is performing his duties. In state court documents, Flanigan stated, "I ran away from the police and had marijhuana [sic] – in my possession," as the basis for his plea.

Subsequently, Flanigan filed suit against Panin and Oakland County under 42 U.S.C. § 1983, alleging that Panin used excessive force when arresting him and that Oakland County's policies led to violations of his constitutional rights. The district court granted Oakland County's motion to dismiss, finding that Flanigan failed to state a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

At the pleading stage, Panin argued that Flanigan's excessive-force claim was barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), because success on that claim by Flanigan would necessarily imply the invalidity of his state guilty plea. However, the district court denied the motion to dismiss.

Panin later moved for summary judgment. The district court partially granted Panin's motion, finding that he was entitled to qualified immunity for his use of a taser and mace on Flanigan. However, it found Panin was not entitled to qualified immunity for his actions of hitting Flanigan in the head several times. The district court also reiterated its previous finding that Flanigan's excessive-force claim was not barred by the *Heck* doctrine.

II.

We review de novo the denial of summary judgment on the basis of qualified immunity. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

III.

Panin raises two issues on appeal. First, he argues that he is entitled to qualified immunity for hitting Flanigan in the head several times. Second, Panin argues that the *Heck* doctrine bars Flanigan's suit. Because we do not have appellate jurisdiction over Panin's assertions under *Heck*, we need only address whether he is entitled to qualified immunity. *See Norton v. Stille*, 526 F. App'x 509, 514–15 (6th Cir. 2013).

"The Supreme Court characterizes a district court's denial of qualified immunity as a final appealable order to the extent that order turns on legal issues." *Roberts v. Manigold*, 240 F. App'x 675, 676 (6th Cir. 2007). If we agree with the district court that Panin could be denied qualified immunity under Flanigan's version of the facts, "our interlocutory jurisdiction ends and a jury must decide which version of the facts prevails." *Id.* at 677. Further, although Flanigan's testimony is at times inconsistent, the court must view the facts in the light most favorable to him. *See Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010). Under Flanigan's version of the facts, he did not fight back and was unable to stand when Panin hit him in the head multiple times.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To recover, Flanigan must show (1) that Panin violated one of his constitutional rights and (2) that the right was "clearly established" at the time of the violation. *Schreiber*, 596 F.3d at 329.

Flanigan's Fourth Amendment right to be free from unreasonable searches and seizures is the constitutional right at issue in this case. *See Graham v. Connor*, 490 U.S. 386, 388 (1989);

*Schreiber*, 596 F.3d at 331–32. Determining whether the force used to effect a particular seizure was reasonable requires the court to carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (quotation marks omitted).

Several factors guide the court's analysis, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The court must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Considering first the severity of the crime at issue in this case, Panin initially approached Flanigan after receiving a dispatch call about a suspicious person. Although Panin later pled guilty to possessing marijuana and resisting and obstructing a police officer, he had not overtly committed any crime when Panin arrived on the scene. However, when Flanigan refused to answer Panin's questions and became uncooperative, the situation escalated. Yet, viewing all of the facts and circumstances, this factor does not shed much light on whether Panin needed to hit Flanigan fifteen to twenty times in the head to subdue him.

The court must next consider whether Flanigan posed an immediate threat to Panin's safety or to the safety of others. The record provides support for Panin to have had safety concerns after the foot chase had ensued. For instance, Panin faced a noncompliant individual who did not respond to the use of a taser or to the use of mace and who approached the home of a third party. Flanigan had also consumed alcohol and numerous drugs in the days and hours before the incident. In this circumstance, the use of some force appears to have been necessary

to subdue Flanigan. However, the fifteen to twenty blows to Flanigan's head would fall outside the range of necessity under Flanigan's version of the facts.

Finally, we must ask whether Flanigan was actively resisting arrest or attempting to evade arrest by flight. Here, Panin argues that his use of force in hitting Flanigan in the head was not excessive because he was attempting to subdue Flanigan in order to arrest him. However, the fact that Flanigan "was not handcuffed at the time he was struck does not preclude a finding of unreasonableness." *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006); *see also Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 686 (6th Cir. 2006) ("Policemen may not strike an arrestee lying on the ground with a stick for about fifteen minutes, nor may they 'jump' up and down on her back repeatedly with a knee—not even if she refuses to produce her hands for cuffing.").

The *Graham* factors suggest that some force was necessary, but the question is *how much*. Flanigan claims that Panin hit him in the head fifteen to twenty times. If true, that was more than what was necessary to subdue Flanigan. At the time that Panin approached, there was no indication that Flanigan had committed a violent crime. Flanigan had not verbally threatened Panin. There was no reason to believe he was armed. He was experiencing the aftereffects of being tased and maced. And Flanigan was not in a position from which he could easily overpower Panin—he was lying on the ground, at most trying to get up. Our precedent requires officers to use "the least intrusive means reasonably available." *Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007) (quotation marks omitted). Moreover, we have cautioned officers against subduing a suspect by hitting him in the head if the officer can target "another, less sensitive part of [the suspect's] body." *Baker*, 471 F.3d at 609. Thus, under Flanigan's version of events, Panin's fifteen to twenty hits to his head were more than what was reasonably

necessary and therefore gratuitous. *See id.*; *see also Shreve*, 453 F.3d at 688. So, those blows would violate the Fourth Amendment.

Still, to withstand Panin's qualified immunity argument, Flanigan must also show that his right to be free from fifteen to twenty hits to the head was clearly established at the time of the claimed violation. "In order for a right to be clearly established for the purposes of qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Estate of Hill v. Miracle*, 853 F.3d 306, 316 (6th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Further, "[t]his inquiry must be undertaken 'in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In other words, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citing *Saucier*, 533 U.S. at 202).

Sixth Circuit case law supports Flanigan's "right not to be struck . . . gratuitously," *Shreve*, 453 F.3d at 688, and Flanigan's version of events permits the court to draw the inference that he did not fight back against Panin's attempts to handcuff him. In such a scenario, Panin's blows to Flanigan's head were gratuitous. *See Baker*, 471 F.3d at 609.

Thus, viewing the facts in the light most favorable to Flanigan, a reasonable jury could conclude that Panin used excessive force. *Roberts*, 240 F. App'x at 678. Accordingly, at this point in the proceedings, Panin "is not entitled to qualified immunity as a matter of law." *Id.*

**AFFIRMED**.

KETHLEDGE, Circuit Judge, dissenting. Qualified immunity protects all police officers except "the plainly incompetent or those who knowingly violate the law." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (citation omitted). Neither label fits Deputy Scott Panin. Hence I would reverse the district court's partial denial of immunity.

The only question on appeal is whether Panin violated Joseph Flanigan's clearly established rights when he (allegedly) hit Flanigan in the head toward the end of their encounter. Our caselaw says that a police officer may use force to subdue a suspect who actively resists arrest—*e.g.*, one who struggles with, threatens, or disobeys an officer. *See Rudlaff v. Gillispie*, 791 F.3d 638, 641-42 (6th Cir. 2015). By contrast, an officer may not use force against a suspect who is compliant or has stopped resisting. *See id.*

Although in this appeal we must accept Flanigan's story as true, we must also view it through the eyes of a reasonable officer on the scene. *See Grawey v. Drury*, 567 F.3d 302, 310 (6th Cir. 2009). In Flanigan's telling, he ran away from Panin into someone's backyard, repeatedly ignoring Panin's orders to stop. After Panin had chased, tased, and maced Flanigan, Panin told him, "Don't get up. Don't resist." Yet Flanigan tried to get up. Only then did Panin hit Flanigan in the head. And only after that did Flanigan give up, follow Panin's commands, and submit to handcuffing. A reasonable officer in this hectic situation could have viewed Flanigan as actively resisting arrest until he was restrained. Since Panin used only the force necessary to subdue Flanigan—and used no further force thereafter—he is entitled to qualified immunity. *See Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509-11 (6th Cir. 2012).

In holding otherwise, the majority stresses that Panin used too much force to subdue Flanigan. Our cases are to the contrary. For example, we have granted qualified immunity to officers who struck a naked (and obviously unarmed) suspect with batons, maced him, and tased

him 38 times, because they needed to use that much force to gain his compliance. *See Williams v. Sandel*, 433 F. App'x 353, 362-63 (6th Cir. 2011). So it is here. Tasing and macing Flanigan had proven ineffective, so Panin was justified in hitting him, and each blow was necessary to overcome Flanigan's resistance. *See Jackson v. Washtenaw County*, 678 F. App'x 302, 309 (6th Cir. 2017). The majority speculates that Panin could have arrested Flanigan with less force, but in Flanigan's own account, he did not give up until Panin had hit him 15 to 20 times.

The majority also draws support from three cases in which we denied qualified immunity, but in those cases officers used force far beyond what was necessary to make prone suspects produce their hands for cuffing, or hit suspects who had already surrendered. *See Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007); *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 686-88 (6th Cir. 2006); *Baker v. City of Hamilton*, 471 F.3d 601, 607-09 (6th Cir. 2006). Neither was true here. As shown above, Flanigan remained defiant throughout, refused to stay on the ground, and resisted being handcuffed. Moreover, Panin used only the force necessary to overcome Flanigan's resistance. Hence Panin did not violate Flanigan's clearly established rights.

I respectfully dissent.