RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0066p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

THURMAN KING,

> *Plaintiff-Appellee*,

*v.*

CITY OF ROCKFORD, MICHIGAN; ROCKFORD DEPARTMENT OF PUBLIC SAFETY; ZACHARY ABBATE and JASON BRADLEY, Officers, in their individual capacities,

> *Defendants-Appellants*.

No. 22-2038

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cv-00259—Jane M. Beckering, District Judge.

Argued: October 26, 2023

Decided and Filed: March 28, 2024

Before: GIBBONS, BUSH, and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Jeffrey C. Gerish, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellants. Stephen R. Drew, DREW, COOPER & ANDING, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellants. Stephen R. Drew, Adam C. Sturdivant, DREW, COOPER & ANDING, Grand Rapids, Michigan, for Appellee.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  Thurman King sued Officers Zachary Abbate and Jason Bradley, the City of Rockford ("City"), the Rockford Public Safety Department ("Department"), and other municipal officers (collectively, "defendants") under 42 U.S.C. § 1983 and state law for events arising out of a 2019 traffic stop.  The district court granted partial summary judgment in favor of defendants, but denied their motion for summary judgment on qualified and governmental immunity grounds for King's federal and state tort claims against Abbate and Bradley, and denied their motion as to King's *Monell*[1] claim against the City and Department.  Defendants appealed this denial.  On review, we affirm in part, and reverse in part, the district court's denial of qualified and governmental immunity to Abbate and Bradley. We dismiss the City and Department's appeal for lack of appellate jurisdiction.

I.

On the night of March 20, 2019, Officer Zachary Abbate, then a Rockford Department of Public Safety officer, pulled Thurman King over, leading to the physical altercation and arrest that underpin the current appeal.  King was driving his fiancée's car home from work around 11:00 p.m. when he passed Abbate's patrol car.  Abbate then drove behind King and noticed that King's license plate light was out, in violation of Michigan law.  Dash camera footage captured the following course of events, which were also the subject of testimony.

According to King, he came to a complete stop at a stop sign after approaching an intersection.  The dash camera footage appears to support this view.  Abbate, on the other hand, testified that King rolled through the stop sign, also a violation of Michigan law.  Other than what he perceived as an incomplete stop, Abbate saw "no evidence of [King] driving erratically." DE 64-2, Abbate Dep. Tr., Page ID 338.

---

[1]*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

Abbate initiated his patrol car lights shortly thereafter as King turned onto another street. King, who happened to live on that street, continued to drive for a short distance before using his turn signal and pulling into his driveway. Approximately thirteen seconds passed between when Abbate initiated his patrol lights and when King pulled into his driveway. Upon pulling into his driveway, King exited his vehicle without waiting for Abbate's command to do so. As King got out, Abbate yelled for King to show his hands, and King complied.

Abbate then admonished King for failing to stop at the stop sign and observed that he smelled marijuana on King's breath. King disputed these accusations. King admitted that he had smoked earlier in the day, but he explained that he hadn't smoked in more than six hours and could not possibly smell like marijuana. Unbeknownst to Abbate, however, King had an unlit joint in his pants pocket at the time. At some point in the interaction, Abbate requested that King submit to a chemical test. King refused.

At this point, the parties' accounts diverge. Abbate alleges that King was "loud," "yelling," and "argumentative" while Abbate ordered him to stay at the rear of his vehicle, in view of the dash camera. *Id.* at Page ID 343–44. Abbate further testified that King walked away from him multiple times, forcing Abbate to grab King's arm to "maintain control and prevent him from fleeing." *Id.* at Page ID 344. King disputes that he walked away from Abbate, saying only that he may have taken "a step towards the house" while calling out to his fiancée, Michelle, who was inside at the time. DE 69-2, King Dep. Tr., Page ID 441–42. Video footage shows King and Abbate arguing, with Abbate attempting to grab King's arm, and King taking a step away and turning toward his house while continuing to yell for his fiancée. Abbate then directed King to step back toward the rear of the vehicle and put his hands behind his back, and King complied. But when King turned to again call out to Michelle, Abbate swung King around, grabbed the back of his coat, and threw him onto the pavement.

After the takedown maneuver, King and Abbate moved outside of the view of the dash camera. King recalled Abbate "screaming" at this point and eventually maneuvering King into handcuffs while King cried out in pain. *Id.* at Page ID 443. At some point Officer Jason Bradley showed up, and King alleges that the officers pinned him to the ground and knelt on his back. King testified that he "wasn't resisting" while on the ground, as he "couldn't even move" if he

tried.  *Id*.  King repeatedly alerted officers that he was having trouble breathing, to which Bradley responded that if King can talk, he can breathe.

After getting King off the ground and into the squad car, Abbate and Bradley noticed an abrasion above King's eye and requested medical personnel to assess the wound.  Officers then searched the car King was driving and found a closed, half-full bottle of alcohol on the floorboard of the vehicle.  The officers charged King with one felony count of obstructing a police officer, and two misdemeanor counts:  operating a vehicle while intoxicated and possessing an open container of alcohol in a vehicle.  The officers did not ticket King for an inoperable license plate light or a failure to stop.

The officers then transported King to Kent County Jail, where he remained in custody overnight, received further medical attention, and underwent a blood test.  The blood test revealed no alcohol and a negligible amount of THC, reportedly "equal to 0.001 alcohol," in King's system.  DE 69-4, Toxicology Report, Page ID 454–55.  Upon his release the next day, King went to the emergency room and was diagnosed with a left elbow sprain, head injury, abrasion, and neck strain.  King testified that he examined his fiancée's license plate light that same day and found it functional and unobstructed.  Ultimately, King pled not guilty to all charges, and a Kent County prosecutor *nolle prosequied* the charges on July 2, 2019.

At the time of King's stop, the police department enforced a policy that required officers to conduct a minimum of two traffic stops during each ten-hour shift.  The Department posted each officer's stop numbers at the end of every month.  Roughly one month before King's stop, Department leadership reprimanded Abbate for failing to meet "the mandatory minimum expectations for traffic stops"—Abbate fell one stop short of his monthly quota for December 2018.  DE 69-1, RDPS Counseling Mem., Page ID 428.  Leadership warned that it would closely monitor Abbate's performance "over the next several months."  *Id.*  After Department leadership again informed Abbate of his deficient stop numbers for June 2019, Abbate resigned.

King filed suit in the Western District of Michigan, alleging federal and state law claims against the officers for their actions in the 2019 traffic stop, and against the City and Department for their failure to train, failure to investigate citizen complaints, and promulgation of a

discriminatory traffic-stop policy. The following claims survived defendants' motion for summary judgment and form the basis for this appeal: (1) King's unreasonable seizure claim against Abbate; (2) King's excessive force claims against Abbate and Bradley; (3) King's *Monell* claim against the City and Department; (4) King's state law assault and battery claims against Abbate and Bradley; and (5) King's state law false arrest claims against Abbate and Bradley.

## II.

"We review de novo a district court's denial of a defendant's motion for summary judgment on qualified immunity grounds." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013) (citing *Tucker v. City of Richmond*, 388 F.3d 216, 219 (6th Cir. 2004)). Similarly, we review de novo an official's entitlement to governmental immunity under Michigan law. *Id.* (citing *Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012)).

Summary judgment is appropriate only if the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Stoudemire*, 705 F.3d at 565 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In assessing the motion, we must view all facts and make all inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where uncontroverted video evidence "so utterly discredit[s]" one party's version of events, so that no reasonable jury could believe him or her, the facts should be viewed "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). But "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

A district court's denial of qualified immunity is immediately appealable only to the extent that it turns on an issue of law, rather than fact. *See Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016). We may thus only review "an appeal challenging the district court's legal determination that the defendant's actions violated a constitutional right or that the right was

clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).  Similarly, we may review a challenge to "a legal aspect of the district court's factual determinations, such as whether the district court properly assessed the incontrovertible record evidence." *Id.* (citing *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014)).  A reviewing court lacks jurisdiction, however, to review the district court's determination of what facts a party may be able to prove at trial.  *Id.* (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)).  When such issues are intertwined, a reviewing court can ignore arguments that rely on disputed facts and resolve the legal issue on a given set of facts.  *See id.* at 813.

Qualified immunity shields officers from civil liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)).  For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)).  While a case need not be directly on point for a right to be clearly established at the time of the violation, "existing precedent must have placed the statutory or constitutional question beyond debate."[2]  *Kisela*, 137 S. Ct. at 1152 (quoting *White*, 580 U.S. at 79).  Qualified immunity therefore protects "all but the plainly incompetent or those who knowingly violate the law." *White*, 580 U.S. at 79 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).  In this context, summary judgment is thus appropriate unless the evidence "viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right

---

[2]Defendants urge this court to depart from precedent and hold that "clearly established law must be based on the Supreme Court's opinions." CA6 R. 26, Appellants' Br., at 29–31. But we have previously laid out the appropriate sources for a right to be clearly established, counseling that "we must first look to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (citing *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002)). Because defendants fail to identify a Supreme Court decision commanding a departure from this circuit's prior jurisprudence and because the facts of this case do not warrant such a departure, we decline to depart from precedent. *See, e.g., Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 770 (6th Cir. 2003) (noting this circuit's procedure for departing from controlling authority and highlighting the requirement of an en banc sitting or a Supreme Court decision that "requires modification").

was clearly established." *Kovacic v. Cuyahoga Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 695 (6th Cir. 2013) (quoting *Morrison v. Bd. of Trustees*, 583 F.3d 394, 400 (6th Cir. 2009)).

III.

A. Unreasonable Seizure

The Fourth Amendment guarantees the right "to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Consistent with the Fourth Amendment, "[a] police officer may stop a motorist when he possesses probable cause of a civil infraction or has reasonable suspicion of criminal activity." *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) (citing *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012)). Under either the reasonable suspicion or probable cause standard, the record demonstrates a genuine dispute of material fact as to the lawfulness of King's stop, rendering summary judgment inappropriate.[3]

Probable cause exists if the "facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person . . . in believing . . . that the suspect committed, is committing, or is about to commit an offense." *Smith v. City of Wyoming*, 821 F.3d 697, 715 (6th Cir. 2016) (alteration in original) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Probable cause may be supported by "less than prima facie proof but more than mere suspicion." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008).

Defendants take issue with the district court's determination that a reasonable jury could find that Abbate lacked probable cause to stop King. Although Abbate claimed to observe King commit two traffic violations before he initiated the stop, the district court found that "a reasonable juror could conclude that neither observation is supported by the dashboard camera footage." DE 74, Op. and Order, Page ID 645–46. While defendants are correct that Abbate

---

[3]For the first time in their reply brief, defendants argue that reasonable suspicion, rather than probable cause, is the relevant standard. Indeed, this circuit's case law has been inconsistent with respect to the requisite level of suspicion required to justify a stop based on suspected civil infractions. *See, e.g., Gaddis*, 364 F.3d at 771 n.6 (noting the inconsistency). But defendants conceded that probable cause was the applicable standard both at the district court level and in their principal brief on appeal, thus waiving any argument that reasonable suspicion instead applies. *See Foster v. Barilow*, 6 F.3d 405, 408 (6th Cir. 1993); *Michigan Bell Telephone Co. v. Strand*, 305 F.3d 580, 590 (6th Cir. 2002) ("This court does not ordinarily address new arguments raised for the first time on appeal.").

could possess probable cause absent an actual violation of the law by King, *see United States v. Collazo*, 818 F.3d 247, 254 (6th Cir. 2016), defendants incorrectly argue that the district court's determination that the quality of King's stop was "not conclusive" entitles Abbate to the benefit of the doubt. CA6 R. 38, Appellants' Reply Br., at 8. Defendants' assertion runs contrary to the legal standard at the summary judgment phase, which requires the court to view "uncertainties left by the video[] in the light most favorable to the [non-moving] Plaintiff." *Latits*, 878 F.3d at 544; *see Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015) (accepting Plaintiffs' version of the facts where the video did "not clearly contradict Plaintiffs' version of events"). As the district court noted, "[a] reasonable juror could find that the light was operating and that [King] came to a complete stop." DE 74, Op. and Order, Page ID 646; *see Godawa*, 798 F.3d at 463. Thus, the district court correctly held that if a jury determines that King committed no traffic violation and Abbate "lacked any objective basis" for the traffic stop, Abbate fails to establish probable cause or reasonable suspicion. *Campbell v. Mack*, 777 F. App'x 122, 131–32 (6th Cir. 2019).

Although defendants highlight that we have found probable cause despite factual disputes about whether a violation occurred, the cases cited by defendants are distinguishable. Defendants first cite *United States v. Macklin*, 819 F. App'x 372 (6th Cir. 2020). At issue in *Macklin* was a denial of a motion to suppress evidence discovered during a traffic stop. In the suppression hearing, the magistrate judge deemed the officer's testimony that he witnessed Macklin roll through a stop sign to be credible. In this posture, unlike at summary judgment, the magistrate judge's credibility determinations were entitled to "considerable weight." *Id.* at 376 (quoting *United States v. Ivy*, 165 F.3d 397, 401 (6th Cir. 1998)). Further distinguishing this case, Macklin conceded that he "stopped somewhat beyond the stop sign," and the record did not include video footage arguably contradicting the officer's account of events. *Id.*

Defendants' citation to *United States v. Ferguson*, 8 F.3d 385 (6th Cir. 1993) is also unavailing. The court in *Ferguson* found probable cause where an officer testified that he stopped a car for failing to have a visible license plate, even though it was later determined that the vehicle had a license tag lying on the back shelf of the car. 8 F.3d at 392. The court deemed the presence of the tag inside the car irrelevant "because the ordinance makes it an offense to drive without a 'visible' license plate, and the vehicle did not have a visible license plate." *Id.*

This is distinguishable from the case at hand, where King's testimony that the license plate light was operable and unobstructed, paired with the ambiguity left open by the video, call into question whether King's license plate light was operable and visible, and thus whether Abbate had grounds for believing there was such a violation.

In support of King's argument and the district court's findings, this circuit has denied summary judgment based on conflicting evidence as to whether drivers committed the traffic violations that formed the bases for subsequent stops. *See Brown v. Chapman*, 814 F.3d 447, 457–58 (6th Cir. 2016); *Campbell*, 777 F. App'x at 131–32. *Brown* addressed whether officers had probable cause to believe that the driver violated the law by driving without headlights on. 814 F.3d at 457. Although officers testified that the driver's lights were off, witnesses testified that the driver's headlights were on immediately after officers pulled the car over. *Id.* at 458. In finding that a genuine dispute of fact remained, the court noted that although one could infer that the driver turned on his lights after being pulled over, one could also infer that the lights were on before the driver was pulled over. *Id.* Because summary judgment required the court to "draw every reasonable inference in plaintiff's favor," the conflicting evidence supported a finding that the officers witnessed no violation and initiated an unconstitutional stop. *Id.*

Likewise, the court in *Campbell* denied an officer's motion for summary judgment when the evidence supported a finding of neither probable cause nor reasonable suspicion that a driver committed a license plate violation, as the stop occurred in broad daylight and the plaintiff submitted an affidavit asserting that his temporary plate was properly posted on the back window and easily visible from behind the vehicle. *Campbell*, 777 F. App'x at 131–33. The court emphasized that the plaintiff, like King, disputed that the officer saw a violation and provided support that no violation in fact occurred. *Id.*

The lens through which we view the facts at the summary judgment stage renders King's case more like *Campbell* and *Brown* than the cases cited by defendants. As in *Campbell* and *Brown*, King presented evidence supporting his contention that he came to a complete stop at the stop sign and that his license plate light was operable and visible. The district court determined that the video showed King's vehicle "stopping at the stop sign," although the quality of the stop was inconclusive. DE 74, Op. and Order, Page ID 635–36. Therefore, the video does not clearly

contradict King's version of events and instead calls into dispute Abbate's deposition testimony that King rolled through the stop sign. The video can accordingly support a finding by a reasonable jury that King stopped for several seconds. Likewise, King's testimony about the operational light the day after his arrest and the video footage dispute Abbate's observation that the license plate light was inoperable. *See Brown*, 814 F.3d at 458. So, under King's version of events, a reasonable jury could find that King came to a complete stop the night in question and that his license plate light was fully operable and unobstructed. A reasonable jury could therefore find that Abbate "lacked any objective basis" for believing that King violated Michigan law, rendering the stop unconstitutional. *Campbell*, 777 F. App'x at 132.

And by the time of the 2019 stop, this circuit recognized the right to be free from a traffic stop unsupported by probable cause as clearly established. *See, e.g.*, *Brown*, 814 F.3d at 458 (deeming the right to be free from a traffic stop for civil infractions absent probable cause clearly established by 2016); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *Whren v. United States*, 517 U.S. 806, 810 (1996) (deeming traffic stops generally reasonable "where the police have probable cause to believe that a traffic violation has occurred"); *Gaddis*, 364 F.3d at 771 n.6 (summarizing the requisite suspicion to justify a traffic stop); *Campbell*, 777 F. App'x at 132 (highlighting that, by 2016, "it was clearly-established that an officer needs either probable cause or reasonable suspicion to conduct a traffic stop," *id.* (citing *Collazo*, 818 F.3d at 253–57)). The district court thus correctly denied qualified immunity for this claim.

## B. Excessive Force

The Fourth Amendment's guarantee against unreasonable seizures encompasses a protection against use of excessive, or unreasonable, force "in the context of an arrest or investigatory stop." *Graham v. Connor*, 490 U.S. 386, 394 (1989). The reasonableness of a use of force is assessed from the perspective of a reasonable officer on the scene without the benefit of "20/20 vision of hindsight." *Id.* at 396–97. This inquiry entails consideration of the totality of the circumstances, including, but not limited to: (1) "the severity of the crime at issue;" (2) "whether the suspect poses an immediate threat to the safety of the officers or others;" and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 8–9 (1985)). In interactions involving multiple uses

of force, like here, we "analyze[] the subject event in segments" to assess the reasonableness of an officer's actions. *Barton v. Martin*, 949 F.3d 938, 952 (6th Cir. 2020) (quoting *Morrison*, 583 F.3d at 401).

As an initial matter, defendants argue that King's excessive force claim was inadequately pled, and that King forfeited any argument to the contrary by failing to respond to this argument in his briefing. We disagree.

Although not presented in the clearest manner, King alleged facts sufficient to plausibly state an excessive force claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Defendants are correct that King did not characterize any claim as an excessive force claim in his complaint. Nevertheless, he alleged facts supporting such a claim, and the record reveals that King developed his excessive force argument so as to adequately allow the district court to make a summary judgment determination.[4] Further, although King did not respond to defendants' forfeiture argument in his briefing, we may exercise our discretion to look past this failure and consider his claim. *See Leary v. Daeschner*, 228 F.3d 729, 741 n.7 (6th Cir. 2000); *cf. Jones v. City of Elyria*, 947 F.3d 905, 922 n.1 (6th Cir. 2020) (Rogers, J., concurring).

### i. Takedown Maneuver

The district court analyzed both uses of force—Abbate's takedown and Abbate and Bradley subsequently kneeling on King's back—together as a single excessive force claim. Although consecutive uses of force can sometimes be analyzed together, *see Moser v. Etowah Police Dep't*, 27 F.4th 1148, 1152–53 (6th Cir. 2022), combined analysis was inappropriate on the facts of this case: because the first use of force is captured by the dash camera footage, while the second occurs out of frame, some of the disputes of material fact that preclude summary judgment on the second use of force do not exist as to the recorded takedown. We therefore

---

[4]In his complaint, King specifically alleged that Abbate or Bradley put their "knee and body weight on [King's] back with him face down on the concrete" repeatedly pleading that he could not breathe. DE 52, Am. Compl., Page ID 220. King further asserted that Abbate and Bradley's actions were "objectively unreasonable," *id.*, and that the officers grabbed him during the stop and threw him to the ground, resulting in injuries that required King to seek medical attention.

analyze the reasonableness of the takedown and kneeling on the ground separately. *See Barton*, 949 F.3d at 952 (6th Cir. 2020).

*Severity of Crimes.* The first *Graham* factor weighs against the reasonableness of the takedown maneuver even assuming that, in addition to the minor traffic violations, probable cause emerged during the stop to believe that King drove under the influence and otherwise resisted arrest. "Conduct that is not a violent or serious crime does not permit an officer to use increased force absent other factors." *Vanderhoef v. Dixon*, 938 F.3d 277, 278 (6th Cir. 2022). At the outset, King's suspected traffic violations fall "within the lowest rung of unlawful activity," *id.*, which "counsel[s] against the use of force exerted." *Shumate v. City of Adrian*, 44 F.4th 427, 442 (6th Cir. 2022). And although tensions then escalated during the stop, "there was minimal (if any) connotation of violence" presented by King's behavior. *See Shumate*, 44 F.4th at 441. Thus, because King was not suspected of particularly serious crimes or crimes involving violence, the first *Graham* factor weighs in favor of King. *See Harris v. City of Circleville*, 583 F.3d 356, 366 (6th Cir. 2009) (weighing the first *Graham* factor in favor of the plaintiff, who was suspected of speeding, DUI, and failure to appear in court).

*Immediate Threat to Officers or Others.* The second *Graham* factor also weighs in favor of King. While defendants emphasize the reasonableness of Abbate's safety concerns in light of King's failure to immediately pull over, his noncompliance with commands, and his continued yelling during the interaction, a reasonable jury could find that King's conduct did not pose an immediate threat that justified a takedown. Indeed, the district court found that "the record supports that [King] was not verbally or physically hostile to Officer Abbate." DE 74, Op. and Order, Page ID 649. Although King may have been loud and argumentative, a reasonable jury could otherwise find him "non-threatening," indicating that the takedown was unreasonable to maintain control of the situation. *Id.* (quoting *Shumate*, 44 F.4th at 446). This view is supported by this circuit's published case law. As this circuit held in *Shumate v. City of Adrian*, "mere agitated hand gestures and profanity, unaccompanied by threats, fall short of the prototypical behavior that would make an officer fear for his physical safety." 44 F.4th at 444 (cleaned up). Defendants' contrary citation to *Fox v. DeSoto*, 489 F.3d 227 (6th Cir. 2007), is unavailing as *Fox* contemplated the use of a takedown on a noncompliant suspect reported to be armed.

489 F.3d at 237. The *Fox* suspect's armed status provided the officer "reason to be concerned about the safety of [the officer] and others under [] circumstances" not present here, as nothing in the record indicates that King was armed. *Id.*; *see Shumate*, F.4th at 444 (highlighting the lack of immediate threat when nothing "suggest[ed] possession or intent to possess a weapon").

To be sure, a reasonable officer would not know that "Michelle" was King's fiancée, and King pulled over shortly, rather than immediately, after Abbate initiated his lights, but since King did not otherwise threaten Abbate, did not indicate he was armed, and was suspected of relatively minor offenses, this factor weighs against the reasonableness of force. *See id.* at 444–46; *LaPlante v. City of Battle Creek*, 30 F.4th 572, 580 (6th Cir. 2022) (crediting officers' concerns that the traffic stop occurred on a dark street and involved a noncompliant suspect and the inability to call back up or conduct pat-downs, but finding the situation not dangerous enough to justify takedown); *but see Bozung v. Rawson*, 439 F. App'x 513, 520 (6th Cir. 2011) (deeming takedown reasonable despite absence of threats or a weapon where a crowd formed around officers, a suspect fled, and the remaining suspect was visibly intoxicated and subject to an arrest warrant).

*Active Resistance or Attempt to Evade Arrest.* The parties primarily dispute whether King actively resisted arrest. The issue of whether a reasonable officer would believe King was actively resisting arrest determines the lawfulness of Abbate's takedown, as we have deemed force such as knee strikes and taser use reasonable in the face of an actively resisting suspect.[5] *See Rudlaff v. Gillispie*, 791 F.3d 638, 641–42 (6th Cir. 2015). Defendants argue that the dash camera footage unambiguously brings this case within the ambit of case law emphasizing the reasonableness of force against actively resisting subjects, and thus the district court erred in ruling otherwise.

---

[5]King argues that "any use of force" would be unreasonable based on Abbate's lack of suspicion that King committed any underlying crimes. CA6 R. 30, Appellee Br., at 36. King does not develop this argument, and a review of cases assessing active resistance in the context of excessive force do not discuss or factor in whether the officer actually possessed a basis to issue the commands in the first place. Accordingly, whether Abbate lacked probable cause to ultimately arrest King is distinct from the inquiry of whether Abbate used excessive force in effectuating that arrest. *See County of Los Angeles v. Mendez*, 581 U.S. 420, 429–30 (2017) (emphasizing that the absence of probable cause to make an arrest does not establish a claim for excessive force) (citing *Beier v. Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004)); *but see Reed v. Campbell Cnty.*, 80 F.4th 734, 750 (6th Cir. 2023) (noting that "[a]ny force used to accomplish an unlawful detention could be deemed unreasonable," but not discussing whether the initial seizure was reasonable in discussion of whether the plaintiff actively resisted arrest).

Active resistance "can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders." *Jackson v. Washtenaw Cnty.*, 678 F. App'x 302, 306 (6th Cir. 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015)); *Rudlaff*, 791 F.3d at 641. Mere passive resistance, in contrast, entails a "lack of physical resistance or verbal antagonism." *Jackson*, 678 F. App'x at 306; *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). This circuit has elaborated that "a failure to present one's arms to an officer upon request without more" constitutes passive resistance at most, but "a physical struggle to maintain control of one's limbs while being placed in handcuffs can be active resistance." *Jackson*, 678 F. App'x at 307; *cf. Shumate*, 44 F.4th at 448–49 (determining that a reasonable juror could find plaintiff merely passively resisting when he pulled his arms back to avoid officer's handcuffs and later failed to provide his hands from beneath his body on the ground).

On one end of the spectrum, this court has deemed the application of force unreasonable against a non-compliant suspect who lacked any "outward manifestation" that "suggested volitional and conscious defiance" toward the officer. *Eldridge*, 533 F. App'x at 533–34. *Eldridge* contemplated the reasonableness of tasing a driver who politely refused an officer's commands to exit his vehicle, and it is emblematic of this circuit's passive resistance jurisprudence. *Id.* at 530. The officer approached Eldridge based on a report of driving under the influence, but Eldridge was in fact experiencing a hypoglycemic medical episode. *Id.* at 531. The court deemed the officer's subsequent taser application unreasonable, finding that "a reasonable officer . . . could not have determined that Eldridge's actions bore the hallmarks of active resistance" where he merely remained seated and mumbling in the face of the officer's repeated commands. *Id.* at 533. *Eldridge* counsels that noncompliance with commands does not, without more, rise to active resistance. *Id.* at 535.

On the other end of the spectrum, we have deemed tasers, knee strikes, and other force necessary to subdue suspects justified where the suspects repeatedly refused to comply and physically resisted arrest. *See, e.g., Earnest v. Genesee Cnty.*, 841 F. App'x 957, 960–61 (6th Cir. 2021) (deeming force reasonable when intoxicated suspect attempted to strike medical personnel and refused to put his hands behind his back). In *Rudlaff v. Gillispie*, for example, we

deemed reasonable the use of a knee strike and taser to subdue a driver who was verbally defiant, swung or jerked his arms toward an officer, and locked up his body to avoid being handcuffed. 791 F.3d at 641–44. Similarly, we have upheld the reasonableness of an officer's taser use against a continuously uncooperative and erratic subject even absent suspicion of a crime. *See Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94–97 (6th Cir. 2012) (concerning suicidal individual who had threatened to fight officers, remained agitated and uncooperative, and refused to move his arms from beneath his body to be handcuffed).

Viewing the facts as presented by the dash camera footage and making all reasonable inferences in favor of King, a reasonable jury could find that King did not actively resist arrest. First, while King was "argumentative" and noncompliant, he was not verbally "hostile" toward Abbate. DE 74. Op. and Order, Page ID 648–49; *see Laury v. Rodriguez*, 659 F. App'x 837, 843 (6th Cir. 2016) (distinguishing between rude and threatening content); *Shumate*, 44 F.4th at 448. And although the video depicts King turning his body away from Abbate, it does not show King being physically hostile or using force against Abbate. *See Lustig v. Mondeau*, 211 F. App'x 364, 369–70 (6th Cir. 2006) (deeming officer's twisting of restrained suspect's arm excessive as suspect remained agitated and yelling); *cf. Rudlaff*, 791 F.3d at 640. To this end, the footage depicts King showing Abbate his hands, returning to the rear of his vehicle, and even putting his hands behind his back for Abbate to apply handcuffs moments before the takedown. The footage is not clear as to whether Abbate then let go of King's arm to initiate a takedown while King had his hands behind his back, or whether King turned to get his arm out from Abbate's grip and step back toward his house. A jury could even interpret King's movement to indicate compliance with Abbate's arrest efforts. *See LaPlante*, 30 F.4th at 580–81 (noting that a reasonable jury could find plaintiff's lifting of his hands in the air as the officer attempted to handcuff him to signify surrender rather than continued noncompliance).

On the other hand, the dash camera footage also demonstrates that King did more than merely failing to present his hands for arrest or otherwise comply with Abbate's commands to remain at the rear of the vehicle. The footage shows King pulling away from Abbate's grasp and stepping toward his house, attempting to free his arm, and turning his body away from Abbate as Abbate tried to grab him. This behavior thus rises above the mere noncompliance with

commands present in the cases cited by King.  *See Sevenski v. Artfitch*, Nos. 21-1391/1402, 2022 WL 2826818, *4–5 (6th Cir. Jul. 20, 2022) (deeming takedown excessive where, under plaintiff's version of events, plaintiff held his hands above his head and merely failed to comply with command to return to his vehicle before takedown); *Ruemenapp v. Oscoda Twp.*, 739 F. App'x 804, 811–13 (6th Cir. 2018) (finding force excessive where, under plaintiff's version of events, he merely inquired about the basis of his arrest before officer pushed and pinned him against a wall, causing him to lose consciousness).

Accordingly, King's conduct runs close to the line distinguishing passive resistance from active.  Because King's conduct "does not fit cleanly within" our existing excessive force case law, King cannot overcome the clearly established hurdle of qualified immunity.  *Rudlaff*, 791 F.3d at 644 (quoting *Cockrell v. City of Cincinnati*, 468, F. App'x 491, 496 (6th Cir. 2012)).

Under the circumstances faced by Abbate, we cannot say that "every reasonable official would have understood" that King's behavior did not rise to active resistance and thus that the takedown violated the Fourth Amendment.  *Zakora v. Chrisman*, 44 F.4th 452, 465 (6th Cir. 2022) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  While officers may not use a takedown against a generally compliant suspect, *see LaPlante*, 30 F.4th at 583, "[t]here is no clearly established principle that prevents officers from taking individuals to the ground during an investigatory detention who have acted aggressively, failed to follow an officer's commands, and whose actions suggest they were trying to flee." *Parsons v. City of Ann Arbor*, No. 22-1338, 2023 WL 3413898, at *3 (6th Cir. May 12, 2023); *see Rudlaff*, 791 F.3d at 643–44 (emphasizing that minimal resistance still constitutes resistance).  Cases deeming levels of force similar to Abbate's takedown unconstitutional tend not to entail physical resistance, such as the pulling and turning demonstrated by King as he and Abbate paced near the rear of his vehicle.  *See Parsons,* 2023 WL 3413898, at *3 (summarizing case law).  The district court accordingly erred in denying qualified immunity for Abbate's takedown maneuver.

ii.  Conduct on the Ground

Although Abbate was entitled to qualified immunity for his use of a takedown maneuver, the district court correctly determined that a genuine dispute of material fact precludes summary

judgment as to the reasonableness of Abbate and/or Bradley's application of a knee on King's back after the takedown.[6] In this circuit, "an officer may not use additional gratuitous force once a suspect has been neutralized." *Morrison*, 583 F.3d at 408 (quoting *Alkhateeb v. Charter Twp. of Waterford*, 190 F. App'x 443, 452 (6th Cir. 2006)). The parties dispute whether King presented resistance to Abbate and Bradley's attempts to handcuff him after the takedown, and thus whether King was effectively neutralized in this position.

Taking King's testimony as true, one or both officers applied pressure or a knee to King's back while he was nonresistant, and potentially already handcuffed on the driveway. During this time, King repeatedly warned officers that he was having trouble breathing. Because the entire interaction between King, Abbate, and Bradley on the ground occurs outside the view of the dash camera footage, the record does not resolve this dispute.[7] Accordingly, because Abbate and Bradley's liability for their conduct on the ground turns on which version of the facts one believes, we affirm the district court's denial of summary judgment on this issue. *See Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000).

And prior to 2019, this circuit had clearly established that "applying pressure to the back of a prone suspect who no longer resists arrest and poses no flight risk is an objectively unreasonable use of force." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir.

---

[6]Defendants argue that the district court erred by not separately analyzing King's excessive force claim against Bradley. Defendants are correct that an officer's liability is based on his own actions, *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010), but King did allege that Bradley personally participated in acts of force against King on the ground. Because the force allegedly used by Bradley occurred outside the view of the dash camera, the same factual issues precluding summary judgment for Abbate also preclude summary judgment for Bradley. *See Eldridge*, 533 F. App'x at 533 ("Because these facts are in dispute, neither can serve as a basis to reverse the district court on its qualified-immunity determination."). And based on the lack of clarity in the record before us as to what transpired during King's arrest and what Bradley knew or observed upon his arrival, this reasoning also applies to our later analysis of King's false arrest claim against Bradley.

[7]This lack of clarity in the record distinguishes this case from cases cited by defendants. *See Bozung*, 439 F. App'x at 520–21 (finding force reasonable when it occurred before the suspect was subdued and handcuffed); *Earnest*, 841 F. App'x at 960 (deeming force reasonable when the suspect continued to resist arrest); *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (deeming force incidental to handcuffing reasonable where suspect conceded that he "twisted and turned" while officers attempted to apply handcuffs, and it was undisputed that officers had continued difficulty restraining him); *Goodrich v. Everett*, 193 F. App'x 551, 555–57 (6th Cir. 2006) (deeming force used against suspect of violent crime after takedown reasonable when suspect had previously attempted to evade police and was not yet neutralized).

2013) (citing *Champion*, 380 F.3d at 901); *cf. Morrison*, 583 F.3d at 408.  Thus, we affirm the denial of qualified immunity as to Abbate and Bradley for this claim.

## C.  *Monell* Liability

Defendants City of Rockford and Rockford Department of Public Safety appeal the district court's partial denial of summary judgment on King's *Monell* claim, alleging that because the individual officers committed no underlying constitutional violation, King's *Monell* claim cannot stand.  But because the district court's partial denial of the City and Department's motion for summary judgment is not a final decision for purposes of appeal, and because the City and Department's appeal does not entail a claim inextricably intertwined with another claim properly before this court, we lack jurisdiction to assess King's *Monell* claim.

Ordinarily, a denial of summary judgment on the issue of liability is not itself a "final decision" and is thus not immediately appealable under 28 U.S.C. § 1291.  *Brennan v. Twp. of Northville*, 78 F.3d 1152, 1157 (6th Cir. 1996).  An appellate court can nonetheless exercise pendent jurisdiction over a § 1983 claim alleging *Monell* liability against a municipality "where the municipality's motion for summary judgment is inextricably intertwined with the qualified immunity analysis properly before the Court." *Shumate*, 44 F.4th at 450 (quoting *Lane v. City of LaFollette*, 490 F.3d 410, 423 (6th Cir. 2007)).

A *Monell* claim is "inextricably intertwined" with a qualified immunity appeal properly before this court if the resolution of the qualified immunity appeal necessarily resolves the *Monell* appeal.  *Martin*, 712 F.3d at 963 (quoting *Mattox v. City of Forest Park*, 183 F.3d 515, 524 (6th Cir. 1999)).  But where a reviewing court determines that a constitutional violation occurred in the qualified immunity context, the *Monell* claim is not resolved by the qualified immunity determination and the court thus lacks jurisdiction over the remaining *Monell* questions.  This is because once a constitutional violation is found, "the question of municipal liability turns not simply on the actions of the individual state actors, but rather on the separate question of whether the violation may be attributed to a municipal policy or failure to train." *Floyd v. City of Detroit*, 518 F.3d 398, 410–11 (6th Cir. 2008); *see Martin*, 712 F.3d at 963; *Shumate*, 44 F.4th at 450 ("Because the district court correctly denied Defendant['s] motion for

summary judgment on the basis of the qualified immunity doctrine, we lack pendent appellate jurisdiction over Defendant City[]'s interlocutory appeal[.]").

In turn, because a jury could reasonably conclude that Abbate committed a constitutional violation by stopping King without probable cause, we lack pendent jurisdiction to consider the City and Department's appeal of King's *Monell* claim regarding the Department's stop policy.

### D. State Law Assault & Battery

Defendants next challenge the district court's denial of governmental immunity for King's intentional tort claims against Abbate and Bradley. Michigan law shields government officers from tort liability when they meet certain statutory criteria. M.C.L. § 691.1407(2). Governmental immunity is an affirmative defense that must be proven by the officer. *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008).

In the intentional tort context, governmental immunity protects officers when the following three conditions are met: "(1) the acts were taken during the course of employment and the employees were acting, or reasonably believed that they were acting, within the scope of their authority, (2) the acts were taken in good faith, and (3) the acts were discretionary-decisional, as opposed to ministerial-operational." *Odom*, 760 N.W.2d at 222 (summarizing the test espoused in *Ross v. Consumers Power Co.*, 363 N.W.2d 641 (Mich. 1984)). The good-faith prong "protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Odom*, 760 N.W.2d at 229. The parties only dispute whether Abbate and Bradley satisfy the good-faith element.

Michigan law defines assault as "an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *Grawey v. Drury*, 567 F.3d 302, 315 (6th Cir. 2009) (quoting *People v. Nickens*, 685 N.W.2d 657, 661 (Mich. 2004)). Battery, in turn, is "an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *Nickens*, 685 N.W.2d at 628 (quoting *People v. Reeves*, 580 N.W.2d 433, 435 n.4 (Mich. 1998)).

While the good-faith element in the government immunity context is subjective, the application of immunity largely tracks the application of qualified immunity in the § 1983 context. *Martin*, 712 F.3d at 963 (denying summary judgment under Ohio law with similar language where "resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive-force determination"); *Shumate*, 44 F.4th at 451 ("Having found that [Defendant]'s actions are not shielded by qualified immunity, we conclude that [Defendant] is not entitled to governmental immunity under [Michigan] law."); *Kent v. Oakland Cnty.*, 810 F.3d 384, 397 (6th Cir. 2016) (same).

The same fact disputes that preclude summary judgment on King's excessive force claim against Abbate and Bradley for their actions on the ground preclude governmental immunity here. Taking King's version of the facts as true, officers applied pressure to his back as he lay on the ground and did not resist. Further, one or both officers then applied a knee to his back after he was subdued and while he cried out repeatedly that he could not breathe. Officer Bradley then responded that if King can talk, King can breathe. A reasonable jury could find that this gratuitous conduct demonstrates a malicious, "wanton or reckless disregard" toward King's rights or safety.[8] *Odom*, 760 N.W.2d at 225; *Brown v. Lewis*, 779 F.3d 401, 420–21 (6th Cir. 2015) (holding that a jury could find malice where an officer threw an otherwise cooperative subject to the ground); *Smith v. Stoneburner*, 716 F.3d 926, 934–35 (6th Cir. 2013) (denying governmental immunity where, under plaintiffs' version of events, officers banged a subject's head against the wall, refused to loosen handcuffs, and "gratuitously shoved" another subject).

On the other hand, because Abbate was entitled to qualified immunity for his takedown of King, he is similarly entitled to governmental immunity for this action. Although the qualified immunity and good faith analysis are not coterminous, they are sufficiently related so as to generate largely the same results here. *See Shumate*, 44 F.4th at 451. We therefore affirm the district court's denial of governmental immunity to Abbate and Bradley for their conduct on the ground but reverse the denial of governmental immunity for Abbate's takedown.

---

[8]Bradley's apparent disregard for King's pleas that he could not breathe further reinforces this finding of malice, as we have previously held that an officer's insensitive comments during a citizen interaction can signal lack of good faith. *See Scozzari v. Miedzianowski*, 454 F. App'x 455, 467 (6th Cir. 2012).

E.  State Law False Arrest

Abbate and Bradley further dispute the district court's denial of summary judgment as to King's false arrest claim under Michigan law.  The officers contend that King's claim fails on the merits because he cannot show that the officers lacked probable cause for his arrest, and that government immunity otherwise insulates their conduct.

A false arrest claim under Michigan law requires that a plaintiff demonstrate that the arrest lacked probable cause.  *Seales v. City of Detroit*, 959 F.3d 235, 243 (6th Cir. 2020).  The district court determined that a reasonable jury could find that the officers lacked probable cause to arrest King for the two offenses asserted:  driving under the influence and resisting arrest.  Specifically, the court determined that evidence in the record of King's "resistance" would not lead every reasonable jury to find probable cause of obstructing a police officer.  DE 74, Op. and Order, Page ID 661.  Similarly, the court found that although officers testified to smelling marijuana, Abbate's concession that King never drove erratically undermined probable cause.  The court then denied governmental immunity, finding that malice could be inferred from the absence of probable cause.

As an initial matter, Abbate and Bradley argue that King forfeited his false arrest claim by failing to respond to defendants' argument for summary judgment in his briefing.  But we may review an issue despite the appellee's failure to respond to an argument raised by the appellant in briefing.  *See Leary*, 228 F.3d at 741 n.7.

The more difficult issue is whether Abbate possessed probable cause to arrest King for obstructing a police officer or for driving while intoxicated under Michigan law.  As to the driving while intoxicated offense, King argues that Abbate lacked probable cause because King did not actually smell like marijuana and was not witnessed driving erratically.  King testified that he had not smoked for more than six hours before the encounter and had eaten multiple meals in the meantime.  King further points to the toxicology report, which found only a negligible amount of THC in his system, far below the minimum level that could lead to impairment.  Similarly, although Bradley testified to smelling "[b]urnt marijuana," King was found only with an *unlit* joint in his pocket.  DE 64-4, Bradley Dep. Tr., Page ID 362.

In light of this evidence, a reasonable jury could determine that officers did not smell marijuana on King and therefore did not possess probable cause that King drove under the influence. According to King, he had not smoked for more than six hours and did not smell like marijuana. And Abbate conceded that King had not driven erratically. Together, those facts should have dispelled Abbate's suspicions that King drove while intoxicated. *See Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) (identifying genuine dispute as to existence of probable cause based on plaintiff's testimony and contemporaneously recorded report that prison official planted heroin on him). In *Romo v. Largen*, 723 F.3d 670 (6th Cir. 2013), we found that a genuine dispute existed as to whether an officer had probable cause that an intoxicated person sitting in a parked vehicle had driven under the influence where the individual told the officer that he had not driven and that his brother had taken away his car keys. *Id*. at 676. While the court recognized that the officer's initial suspicion based on the presence of an intoxicated person in a vehicle was reasonable, it noted that a jury could find that the individual's responses to the officer's questions should have "dispelled those suspicions." *Id*. A reasonable jury could come to the same conclusion here.

Similarly, a reasonable jury could find that officers lacked probable cause to believe that King resisted arrest under Michigan law. Michigan's resisting arrest statute covers "an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers" an officer performing his or her duties. M.C.L. § 750.81D1. The statute defines "obstruct" to include the "use of physical interference or force or a knowing failure to comply with a *lawful* command." M.C.L. § 750.81(D)(7)(a) (emphasis added). The Michigan Supreme Court has interpreted this statute to incorporate the common law principle that "one may use such reasonable force as is necessary to . . . resist an illegal arrest." *People v. Moreno*, 814 N.W.2d 624, 628 (Mich. 2012) (quoting *People v. Krum*, 132 N.W.2d 69, 72 (Mich. 1965)) (rejecting prior cases that deemed this common law right abrogated by statute). King argues that to the extent he resisted Abbate's commands, he was entitled to do so under Michigan's common law right to resist an unlawful arrest, thus vitiating any violation. Indeed, based on the prior findings that, when viewing the facts in favor of King, the officers lacked probable cause both for the initial stop and for driving under the influence, a reasonable jury could find that King's resistance was triggered by

Abbate's *unlawful* commands and was thus itself lawful.[9]  *See Moreno*, 814 N.W.2d at 628; *People v. Murawski*, No. 365852, 2023 WL 7097124, at *8 (Mich. Ct. App. Oct. 26, 2023) (reaffirming *Moreno*'s requirement that the underlying arrest be lawful to sustain a charge of resisting arrest).

In assessing the applicability of governmental immunity to this claim, however, the district court did not apply the correct standard.  The district court cited Sixth Circuit case law for the proposition that "malice may be inferred from absence of probable cause."  DE 74, Op. and Order, Page ID 661 (citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254 (6th Cir. 2010)).  But Michigan's Supreme Court has recognized that governmental immunity protects an officer "if he acted in good faith and honestly believed that he had probable cause to arrest, even if he later learned that he was mistaken."  *Odom*, 760 N.W.2d at 229; *see Rudolph v. Babinec*, 939 F.3d 742, 753 (6th Cir. 2019) (per curiam) (deeming lack of probable cause insufficient to surpass governmental immunity when plaintiff failed to provide evidence of malice).

Thus, King must point to evidence that could support a jury finding that Abbate and Bradley acted with malice in effectuating the arrest.  *See Brown*, 779 F.3d at 420 (determining whether the record supported a finding of malice after concluding that the district court wrongly conducted an objective inquiry).  King did so here by creating a genuine dispute as to whether Abbate and Bradley fabricated the smell of marijuana requisite for the driving under the influence charge—which, in turn, was the basis for the resisting arrest charge—thus enabling a reasonable jury to infer a finding of malice.  *See Romo*, 723 F.3d at 677 (noting that a finding that the officer lied about his basis for arrest would be "strong evidence of malice").  We thus affirm the district court's denial of governmental immunity for this claim.  *See Leary*, 228 F.3d at 741 n.7 ("[T]his court can affirm the district court on any basis supported by the record.").

---

[9]This may appear incongruous with a finding that a suspect resisted arrest in the excessive force context. But a suspect can actively resist arrest in the excessive force context seemingly without violating the Michigan resisting arrest statute because the statute, unlike the Fourth Amendment, incorporates a common law right to carry out the resistance.

IV.

For the reasons stated above, we affirm the district court's denial of qualified immunity to Abbate for King's unreasonable seizure claim. Similarly, we affirm the district court's denial of qualified immunity to Abbate and Bradley for their application of force to King while on the ground, but we reverse the denial of qualified immunity to Abbate for his takedown maneuver. Likewise, we affirm the district court's denial of governmental immunity to Abbate and Bradley for their conduct on the ground, but reverse the denial of governmental immunity to Abbate for his takedown maneuver for King's assault and battery claims. We also affirm the district court's denial of governmental immunity to Abbate and Bradley for King's false arrest claim. Finally, we dismiss the City and Department's municipal liability appeal for lack of appellate jurisdiction.